The COMMERCIAL BANK OF KUWAIT,
Plaintiff–Appellee,

v.

RAFIDAIN BANK and Central Bank
of Iraq, Defendants–Appellants.

No. 533, Docket 93–7552.

United States Court of Appeals,
Second Circuit.

Argued Nov. 19, 1993.

Decided Jan. 19, 1994.

Brian T. Murnane, New York City (Richards & O'Neil, Edward L. Powers, of counsel), for defendants-appellants.

Robert Penchina, New York City (Rogers & Wells, Donald F. Luke, Dawn M. Conry, of counsel), for plaintiff-appellee.

Before: FEINBERG, PIERCE and MINER, Circuit Judges.

FEINBERG, Circuit Judge:

Defendants Rafidain Bank and Central Bank of Iraq (respectively, Rafidain and CBI; collectively the Iraqi Banks or appellants) appeal from a judgment dated May 5, 1993 in the United States District Court for the Southern District of New York, Leonard

B. Sand, J., granting the motion of plaintiff-appellee Commercial Bank of Kuwait (Commercial) for a default judgment. Commercial seeks recovery on certain "garden-variety" commercial obligations owed to it by the Iraqi Banks. This appeal requires us to examine the "commercial activity" exception to sovereign immunity contained in the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1330, 1602–1611 (FSIA); the requirements for obtaining a default judgment under the FSIA; and the application of the "good cause shown" standard of Fed.R.Civ.P. 55(c) to a foreign sovereign's opposition to entry of a default judgment. For the reasons given below, we affirm the judgment of the district court.

## I. Background

### A. Commercial's Allegations Against the Iraqi Banks

This controversy stems in part from the situation in the Middle East that started with Iraq's invasion of Kuwait in August 1990 and led to open hostilities between the United States and Iraq in early 1991. Iraq suspended its payments under various obligations, including those at issue in this litigation.

Rafidain is a commercial bank wholly owned by the Republic of Iraq. CBI is the central banking authority in Iraq, analogous to the Federal Reserve in the United States. Both entities are therefore "agenc[ies] or instrumentalit[ies] of a foreign state" under the FSIA, 28 U.S.C. § 1603. In the 1980s, Rafidain entered into numerous loan and letter of credit transactions involving international banks. CBI guaranteed some of Rafidain's payment obligations to facilitate Rafidain's access to loans.

This litigation involves loan agreements, guarantees, supplementary agreements and letters of credit with a total value of more than $1.1 billion. Commercial participated in syndicates formed by lending banks to spread the risks of these transactions with Rafidain. As a member of the lending syndicates, Commercial's share of the outstanding payment obligations was approximately $33 million. Commercial's claims against CBI are based on CBI's guarantees of Rafidain's

obligations and on a letter of credit under which Commercial paid more than $7.4 million.

### B. Proceedings in the District Court

Commercial started this litigation in September 1991 by filing a complaint consisting of 11 counts. Commercial had difficulty serving the summons and complaint on the Iraqi Banks, and in December 1991 the district court directed an alternative method of service.

In January 1992, Commercial advised the district court that it had achieved service. Pursuant to 28 U.S.C. § 1608(d),[1] appellants had 60 days to file their responses. Appellants failed to comply with this requirement. In May 1992, Commercial moved for default judgment on the eight counts of the complaint then remaining.[2] The Iraqi Banks first appeared after the motion was filed. The district court granted appellants' counsel an extension of time to file papers in opposition to Commercial's motion. Appellants' counsel filed a memorandum in opposition to the motion on July 22, 1992, one day before a scheduled hearing in the district court.

At the July 23 hearing, the district court indicated that it would not enter a default judgment against the Iraqi Banks if there were meritorious defenses to Commercial's claims. The district court granted appellants' counsel additional time to file papers demonstrating the existence of meritorious defenses, and referred the case to a magistrate judge for a report and recommendation on Commercial's motion for default judgment.

On August 31, 1992 Magistrate Judge James C. Francis IV issued his Report, finding that (1) the Iraqi Banks' default was willful; (2) denial of Commercial's motion would prejudice Commercial; and (3) the Iraqi Banks presented no meritorious defenses. Accordingly, the magistrate judge concluded that the Iraqi Banks had failed to

show good cause under Fed.R.Civ.P. 55(c) why the court should deny the motion for default judgment. On September 18, 1992, over the Iraqi Banks' objections, the district court adopted the magistrate's Report. In May 1993, the district court entered final judgment for Commercial on its motion for default judgment. The Iraqi Banks timely filed their joint notice of appeal in June 1993.

### II. Discussion

On appeal, the Iraqi Banks argue: (1) the district court lacked jurisdiction to hear several of the counts in the complaint because the Iraqi Banks enjoyed sovereign immunity; (2) Commercial did not satisfy the requirement of § 1608(e) of the FSIA that a party seeking a default judgment present "evidence satisfactory to the court"; and (3) the district court abused its discretion in finding that the Iraqi Banks failed to show good cause why the motion for default judgment should be denied under Fed.R.Civ.P. 55(c). We consider these arguments mindful that "default judgments are disfavored, especially those against foreign sovereigns." *First Fidelity Bank, N.A. v. Government of Antigua & Barbuda*, 877 F.2d 189, 196 (2d Cir.1989).

### A. Jurisdiction Under the FSIA

■ The Iraqi Banks contend that the district court erred in applying the FSIA's "commercial activity" exception to sovereign immunity to Counts V–VII of the complaint, and therefore lacked jurisdiction to consider those counts.

■ The FSIA provides the "sole basis" for obtaining jurisdiction over a foreign sovereign in the United States. *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439, 109 S.Ct. 683, 690, 102 L.Ed.2d 818 (1989). Under the FSIA, a "foreign state shall be immune from the jurisdiction of the courts of the United States and of the states" unless one of several statutory excep-

---

1. Section 1608(d) provides:

   In any action brought in a court of the United States or of a State, a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state shall serve an answer or other responsive pleading to the

   complaint within sixty days after service has been made under this section.

2. Before making this motion, Commercial had withdrawn three of the original 11 counts of the complaint.

tions applies. 28 U.S.C. § 1604. We review de novo the district court's conclusions of law regarding jurisdiction under the FSIA. *Shapiro v. Republic of Bolivia*, 930 F.2d 1013, 1016–17 (2d Cir.1991).

The "commercial activity" exception to sovereign immunity provides, in relevant part, that a foreign sovereign or its agencies and instrumentalities:

> shall not be immune from the jurisdiction of the courts of the United States or of the States in any case ... in which the action is based ... upon an act outside the territory of the United States in connection with a commercial activity of the foreign sovereign elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2). See also 28 U.S.C. § 1603(d) (defining "commercial activity" as "either a regular course of commercial conduct or a particular commercial transaction or act"); *Texas Trading & Milling Corp. v. Federal Republic of Nigeria*, 647 F.2d 300, 307–08 (2d Cir.1981), cert. denied, 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982).

The Supreme Court has recently clarified the "direct effect" language of § 1605(a)(2). *Republic of Argentina v. Weltover*, —— U.S. ——, —— – ——, 112 S.Ct. 2160, 2168–69, 119 L.Ed.2d 394 (1992). *Weltover* held that Argentina's unilateral rescheduling of bond payments had a "direct effect" within the meaning of § 1605(a)(2) because New York was the place of payment. *Id.*

Similarly, the agreements at issue in Counts V–VII require the Iraqi Banks to make payments in U.S. dollars into accounts in New York City. The Iraqi Banks concede that these transactions constitute "commercial activity" under § 1603(d). Nevertheless, they argue that the "commercial activity" exception does not apply because the payments were to be made not directly to Commercial but to New York bank accounts held by the lead banks of the various lending syndicates. The Iraqi Banks thus contend that, because the United States is not the place of performance of any contractual obligations owed to this plaintiff, there is no "direct effect in the United States" within the meaning of § 1605(a)(2).

We reject appellants' attempt to limit the Court's opinion in *Weltover*. The "commercial activity" exception of the FSIA withdraws immunity in cases involving essentially private commercial activities of foreign sovereigns that have an impact within the United States. This reflects the "restrictive" theory of sovereign immunity that underlies the FSIA. See *Jackson v. People's Republic of China*, 794 F.2d 1490, 1493 (11th Cir.1986), cert. denied, 480 U.S. 917, 107 S.Ct. 1371, 94 L.Ed.2d 687 (1987); H.R.Rep. No. 1487, 94th Cong., 2nd Sess. 7 (1976), reprinted in 1976 U.S.C.C.A.N. 6604, 6605; Joseph W. Dellapenna, Suing Foreign Governments and Their Corporations § 1.2, at 3–8 (1988). The focus of § 1605(a)(2) is the activity of the sovereign. If the sovereign's activity is commercial in nature and has a direct effect in the United States, then the jurisdictional nexus is met, no immunity attaches, and a district court has the authority to adjudicate disputes based on that activity.

■ The failure of the Iraqi Banks to remit funds in New York, as they were contractually bound to do, had a direct effect in the United States under *Weltover*. Furthermore, the requisite "material connection" between Commercial's cause of action and the "commercial activity" that is the jurisdictional basis is met despite Commercial's reliance on an agent to collect the sums due. Cf. *Arriba Ltd. v. Petroleos Mexicanos*, 962 F.2d 528, 533 (5th Cir.), cert. denied, —— U.S. ——, 113 S.Ct. 413, 121 L.Ed.2d 337 (1992). Thus, the district court had jurisdiction to hear Commercial's claims. The Iraqi Banks may still argue, as they do, that Commercial does not have standing to complain of that breach of duty. That contention is discussed below.

Therefore, we agree with the district court that it had jurisdiction under the "commercial activity" exception, and that the Iraqi Banks do not enjoy sovereign immunity from any part of this action.

**B. Default Judgments Under the FSIA**

■ The Iraqi Banks argue that Commercial failed to satisfy the requirements of the FSIA for obtaining a default judgment. The FSIA provides:

No judgment by default shall be entered by a court of the United States or of a State against a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state, unless the claimant establishes his claim or right to relief by evidence satisfactory to the court....

28 U.S.C. § 1608(e). The Iraqi Banks contend that Commercial did not present sufficient evidence to support its claims and that the district court failed to make findings before entering the default. Specifically, the Iraqi Banks argue that Commercial could not have satisfied the evidentiary burden as to Counts I–IV of the complaint because the loans underlying those counts were never properly accelerated as required by the loan agreements, and that Commercial failed to establish its standing to sue on Counts V–VII of the complaint.

■ Congress promulgated § 1608(e) to provide foreign sovereigns with the same protections from default judgments that the federal government enjoys under Fed. R.Civ.P. 55(e).[3] House Report 1487 at 26, 1976 U.S.C.C.A.N. at 6625; *Amernational Indus., Inc. v. Action–Tungsram, Inc.*, 925 F.2d 970, 975–76 (6th Cir.), cert. denied, —— U.S. ——, 111 S.Ct. 2857, 115 L.Ed.2d 1024 (1991) (noting the "identical wording" of § 1608(e) and Rule 55(e)). Rule 55(e) reflects Congress' recognition "that the government is sometimes slow to respond and that the public fisc should be protected from claims that are unfounded but would be granted solely because the government failed to make a timely response." *Marziliano v. Heckler*, 728 F.2d 151, 157–58 (2d Cir.1984). However, neither Rule 55(e) nor § 1608(e) relieves the sovereign from the duty to defend cases and to obey court orders. *Amernational Indus.*, 925 F.2d at 975–76 (citing *Alameda v. Secretary of Health, Educ. & Welfare*, 622 F.2d 1044, 1047–48 (1st Cir. 1980)).

Thus, when the United States or a foreign sovereign defaults, the district court must determine whether the plaintiff's allegations are supported by evidence. While in some cases this will require a hearing, we have held that Rule 55(e) does not "require an evidentiary hearing if one would ordinarily not have been held, nor [does the Rule] require the court to demand more or different evidence than it would ordinarily receive in order to make its decision." *Marziliano*, 728 F.2d at 158. Further, we have said that Rule 55(e) does not require explicit findings, and that the district court's decision should be affirmed so long as "there is an adequate basis in the record for inferring that the district court ... was satisfied with the evidence submitted" in support of the plaintiff's claims. Id. Likewise, we do not believe that § 1608(e) requires evidentiary hearings or explicit findings where the record shows that the plaintiff provided sufficient evidence in support of its claims.

■ The record shows that the loans involved in Counts I–IV were properly accelerated and that the Iraqi Banks were notified, as required by the agreements. This evidence, in the form of affidavits and exhibits, was submitted well before the district court entered the May 1993 default judgment under attack. Because the record contains sufficient evidence to support Commercial's claims as to Counts I–IV, we believe the district court correctly applied § 1608(e) with respect to those counts.

■ As indicated above, the Iraqi Banks also assert that Commercial failed to establish that it had standing to sue on Counts V–VII. They contend that Commercial does not have standing because Commercial lacks privity with the Iraqi Banks, and because the participation agreements authorize only the lead banks to sue and only after obtaining the approval of the majority of the participating banks.

The district court rejected these challenges to Commercial's standing. The magistrate's Report noted that the lead banks entered into each of these agreements as agent of the participating banks. Under English law, which governs here pursuant to express pro-

---

**3.** Rule 55(e) provides:

No judgment by default shall be entered against the United States or an officer or agen-

cy thereof unless the claimant establishes a claim or right to relief by evidence satisfactory to the court.

visions of the agreements, an undisclosed principal has standing to sue on a contract. Moto Vespa S.A. v. MAT (Brittania Express) Ltd., [1979] 1 Lloyd's Rep. 175, 178–79; Teheran–Europe Co. v. S T Belton (Tractors), [1968] 2 QB 545 ("It is a well-established rule of English law that an undisclosed principal can sue and be sued on a contract, even though his name and even his existence is undisclosed, save in those cases when the terms of the contract expressly or impliedly confine it to the parties to it."); *Ford v. Williams*, 62 U.S. (21 How.). 287, 289, 16 L.Ed. 36 (1858).

The terms of the agreements here do not "expressly or impliedly" preclude Commercial from bringing this action. While the participation agreement at issue in Counts V and VI authorizes the "Confirming Bank" to sue "only if requested to do so by the Majority Banks," this provision does not abrogate the rights of participating banks to sue on their own. Indeed, the agreement points the other way, providing that the rights of the parties "under the general law" are expressly reserved. We believe that this includes the right to sue as undisclosed principal as allowed under the governing English law. Provisions in the relevant agreements for distributing proceeds recovered by participating banks support this reading of the agreements.

Further, it is hard to believe that the Iraqi Banks did not know that the loans were the subject of participation agreements and that they, as borrowers, were potentially liable to the participants. Such loan participations are common practice, as appellants' counsel conceded at oral argument.

We are satisfied that the record contains "evidence satisfactory to the court" that Commercial had standing to sue on these agreements as either a known or an undisclosed principal, and that the district court correctly applied § 1608(e) to Counts V–VII as well as to Counts I–IV.

**C. Opposition to Entry of Default Judgment—The Rule 55(c) Standard**

■ The district court evaluated appellants' opposition to the motion for a default judgment under the "good cause shown" standard of Fed.R.Civ.P. 55(c).[4] *Meehan v. Snow*, 652 F.2d 274, 276 (2d Cir.1981). Under Rule 55(c), the factors to be considered in deciding whether to relieve a party of a default are "whether the default was willful, whether setting it aside would prejudice the adversary, and whether a meritorious defense is presented." *Id.* at 277. The district court must consider all of these factors. See *Information Sys. & Networks Corp. v. United States*, 994 F.2d 792, 796 (Fed.Cir.1993) (noting that the majority rule is to consider all three factors). We review the district court's decision to grant the default judgment for abuse of discretion, *Davis v. Musler*, 713 F.2d 907, 912 (2d Cir.1983).

**1. Willfulness of the Iraqi Banks' Default**

■ By adopting the magistrate's Report, the district court accepted his findings, including the finding that the default of the Iraqi Banks was willful. The Report notes that "[t]he Iraqi Banks have never stated that they failed to receive actual notice of the claims against them, nor have they alleged facts that would prove that the war in early 1991 against Iraq prevented response in January, 1992, to Commercial Bank's summons and complaint. Therefore, an inference of willful default is justified."

The Iraqi Banks contend that the default was caused by the effects of the Gulf War, and was therefore not willful. In support of this assertion they point to the devastation resulting from the war, the economic sanctions imposed on Iraq and the freeze of Iraqi assets. Appellants claim that these circumstances made it impossible for them to obtain foreign currency. Appellants further assert that they were under the mistaken impression that the freeze of their assets precluded lawsuits against them from going forward.

We agree with the district court's finding that the Iraqi Banks' default was willful. It

4. Rule 55(c) provides:
For good cause shown the court may set aside an entry of default and, if a judgment by default has been entered, may likewise set it aside in accordance with Rule 60(b).

is true that a relatively short period passed between the time appellants' response to the complaint was due and the time Commercial moved for default judgment. However, Commercial alleged in the district court—and there was no persuasive reason for the district court to have doubted the charge—that the Iraqi Banks purposely evaded service for months before alternative service was authorized. Moreover, we see no reason to disturb the district court's finding that the Middle East hostilities did not prevent the Iraqi Banks from responding to the complaint. For example, as Rafidain itself made clear in the district court, it did not default in involuntary liquidation proceedings commenced against it in England in February 1991, when the Gulf War was on.

■ Finally, we do not think that a defendant's mistaken belief that it enjoys sovereign immunity automatically precludes a finding of willfulness. In support of this proposition, appellants rely on two cases: *Jackson,* 794 F.2d at 1496–97; and *Carl Marks & Co. v. U.S.S.R.,* 665 F.Supp. 323 (S.D.N.Y.1987), aff'd, 841 F.2d 26 (2d Cir.), cert. denied, 487 U.S. 1219, 108 S.Ct. 2874, 101 L.Ed.2d 909 (1988). While the district court in *Carl Marks & Co.* noted that "the Soviet Union's willful default is tempered by its genuine but unfounded belief that it enjoys [ ] sovereign immunity," id. at 332, the court went on to find that the defendant had presented meritorious defenses. Id. Moreover, our affirmance in that case rested solely on lack of jurisdiction because of the non-retroactivity of the FSIA. 841 F.2d at 27. In *Jackson,* which of course is not binding upon us, the 11th Circuit similarly held that the FSIA did not apply retroactively. *Jackson,* 794 F.2d at 1497–99. It is true that the opinion there did refer to "the misconception by an ancient and proud sovereign [China]," id. at 1496, in affirming the district court's discretionary decision to set aside a default. But here the Iraqi Banks in effect ask us to hold that if there is such a misconception and the district court nevertheless refuses to set aside a default, we must reverse. We see no persuasive reason to so limit the district court's exercise of its discretion.

### 2. Lack of Meritorious Defenses

The Iraqi Banks raise several defenses. We have already discussed at some length the defense of sovereign immunity and other defenses in connection with consideration of §§ 1605(a)(2) and 1608(e). None of the remaining defenses urged upon us require further discussion. The district court dealt with all of them in satisfactory fashion.

### 3. Prejudice

■ The district court found that setting aside the default judgment would prejudice Commercial because unfrozen Iraqi assets have diminished with the passage of time and because the delay has caused problems in the prosecution of this action. While the record does not strongly support a finding of prejudice, we need not scrutinize this factor further because the Iraqi Banks' willful default and the absence of meritorious defenses were sufficient to support the district court's disposition of the case. Cf. *SONY Corp. v. Elm State Elec., Inc.,* 800 F.2d 317, 320–21 (2d Cir.1986) ("Good cause to reopen was not established because [defendant] had failed to demonstrate that it possessed a meritorious defense."); *Marziliano,* 728 F.2d at 157 (no abuse of discretion where willful default and lack of meritorious defenses clearly established).

In sum, we are satisfied that the district court adequately considered the relevant factors in entertaining the Iraqi Banks' opposition to the default judgment, and that there was no abuse of discretion.

The judgment of the district court is affirmed.

Dana Leigh THOMPSON,
Plaintiff–Appellant,

v.

COUNTY OF FRANKLIN, William
A. Hughes, Treasurer of Franklin
County, Defendants–Appellees.

No. 343, Docket 92–9323.

United States Court of Appeals,
Second Circuit.

Argued Sept. 24, 1993.

Decided Jan. 20, 1994.

Arlinda F. Locklear, Jefferson, MD, for Appellant.

David E. Peebles, Syracuse, NY (Patrick M. Connors, Hancock & Estabrook, Syracuse, NY, of counsel), for Appellees.

Before: MESKILL, KEARSE and WINTER, Circuit Judges.

MESKILL, Circuit Judge:

This is an appeal from a judgment of the United States District Court for the Northern District of New York, McCurn, J., dismissing plaintiff's complaint on the ground

that she lacks standing to challenge a county government's assessment and collection of taxes on her real property that she alleges is within the territorial boundaries of an Indian reservation. For the reasons stated below, we reverse and remand.

## BACKGROUND

Plaintiff-appellant, Dana Leigh Thompson (Thompson), is an enrolled member of the federally recognized St. Regis Mohawk Indian Tribe (Tribe). On January 27, 1989, Thompson purchased sixty-eight acres of land (Property) located in the vicinity of both Franklin County, New York and the St. Regis Mohawk Indian Reservation ("St. Regis Reservation" or "Reservation"). The Property, which is divided into two separate tax parcels, was purchased by Thompson in fee simple.

Commencing with the 1989 tax year, and continuing to present, the defendants-appellees, the County of Franklin and William A. Hughes, Treasurer of Franklin County (collectively "County"), assessed taxes on the Property. Thompson refuses to pay the taxes levied on the Property, however, on the ground that it is situated within the territorial boundaries of the St. Regis Reservation and, thus, beyond the reach of the County's taxing jurisdiction.

Relying on a series of agreements dating back to 1816 (1816 Conveyance Agreements), which convey to the state of New York (State) interests in several tracts of land within the boundaries of the St. Regis Reservation, the County rejected Thompson's claim that her Property lay beyond its territorial jurisdiction to tax. On August 24, 1992, the County filed a tax lien on the Property for the unpaid 1989 taxes. The tax lien, moreover, notified Thompson that outstanding property taxes remained for 1990, 1991 and 1992, in addition to 1989, and that the County intended to perfect title to the Property by December 28, 1992 if the taxes remained unpaid. As of August 1992, the total amounts of taxes claimed by the County on the Property were respectively $9,491.79 and $820.24.

On September 17, 1992, Thompson filed suit against the County in state court, pursuant to 25 U.S.C. § 233,[1] seeking a declaration that her Property was immune from the County's power to tax real property and an injunction precluding the County from assessing and collecting taxes on the Property and from pursuing any statutory remedies against her for failure to pay those taxes. In her complaint, Thompson alleged (1) the Property is located within the boundaries of the St. Regis Reservation as established by the United States in the Treaty with the Seven Nations of Canada of 1796, 7 Stat. 55 (Treaty of 1796), (2) neither an act of Congress nor the 1816 Conveyance Agreements, to date, have altered the boundaries of the St. Regis Reservation as established by the Treaty of 1796, and (3) the Property is located within the jurisdictional boundaries of the St. Regis Reservation, not the County, for the purposes of taxation.

On October 1, 1992, the County removed the action to the United States District Court for the Northern District of New York and proceeded to file a motion to dismiss the complaint on several grounds. Specifically, the County contended the action was barred by the preclusive or *res judicata* effect of *United States v. Franklin County*, 50 F.Supp. 152 (N.D.N.Y.1943). In the alternative, the County argued that Thompson lacked standing as an individual member of the Tribe to assert a claim that ultimately depended on a tribal right: a challenge to the validity of land conveyances on Indian reservations under the Nonintercourse Act, 25 U.S.C. § 177.[2] In turn, Thompson filed a motion to remand the case to state court pursuant to 28 U.S.C. § 1447(d) on the

---

1. 25 U.S.C. § 233 states in pertinent part:
   That nothing herein contained shall be construed as subjecting the lands within any Indian reservation in the State of New York to taxation for State or local purposes.

2. 25 U.S.C. § 177 states in pertinent part:

   No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution.

ground that the district court lacked subject matter jurisdiction over the action under the Tax Injunction Act, 28 U.S.C. § 1341.

In its memorandum of decision, the district court denied Thompson's motion to remand the case to state court. *See Thompson v. County of Franklin,* No. 92–CV–1258, 1992 WL 554369, at *10 (N.D.N.Y. Nov. 30, 1992). Specifically, the district court found that the Tax Injunction Act did not preclude federal jurisdiction in this matter. Thompson does not appeal the district court's denial of her motion to remand.

Turning next to the County's motion to dismiss, the district court found that Thompson's claim did indeed "turn[ ], in large part, upon whether the series of agreements, beginning in 1816, conveying the Indians' interest in the land of New York State, violated the Nonintercourse Act." The court reasoned that, "even though not mentioned in her complaint," an allegation that the 1816 Conveyance Agreements, on which the County relies for its taxation authority, violate the Nonintercourse Act was a "necessary component" of Thompson's claim. Viewing her action from this perspective, the district court concluded that Thompson was subject to the prudential standing requirements governing all private actions under the Nonintercourse Act, requirements that Thompson as an individual member of the Tribe could not satisfy. Accordingly, the district court dismissed the complaint for lack of standing and never reached the issue of whether her action was barred on the merits under the *res judicata* effect of *Franklin County.* Thompson appeals the district court's ruling that she lacks standing. *Id.* at *10–*12.

## DISCUSSION

This appeal raises the issue of whether an individual member of an Indian tribe has standing to challenge the taxing power of a local government over her property which she alleges is located within the historical boundaries of an Indian reservation, but that was previously conveyed from the tribe to non-Indian land owners. Because we hold that an individual member of an Indian tribe has standing to challenge a local government's taxing power in cases, such as this

one, where the individual plaintiff predicates that challenge on the jurisdictional boundaries of the Indian reservation itself, not the validity of the conveyance to non-Indians of land interests located within those boundaries, we reverse the district court's dismissal.

### I. *Standard of Review*

As a preliminary matter, we note that the unsettled nature of the standing doctrine creates a need for some clarification of the parameters of our review. *See Rent Stabilization Ass'n v. Dinkins,* 5 F.3d 591, 594 (2d Cir.1993) ("standard of review of a dismissal for lack of standing is not quite as clear" as that under 12(b)(6), Fed.R.Civ.P.); 13 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3531, at 347–51 (2d ed. 1984) (Wright & Miller) (difficulties with the doctrine "inevitably beset any attempt to articulate and apply any clear principles of standing"). "Standing has been called one of 'the most amorphous [concepts] in the entire domain of public law.'" *Flast v. Cohen,* 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968). Simply put, "'[s]tanding' is not a term used for its precision." *Graddick v. Newman,* 453 U.S. 928, 938, 102 S.Ct. 4, 10, 69 L.Ed.2d 1025 (1981) (Rehnquist, *J.*).

The district court and the parties appear to treat the issue of Thompson's standing as properly raised on a motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6), rather than as a defect in federal jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1). While "we realize that dismissals for lack of standing may be made pursuant to Fed.R.Civ.P. 12(b)(6) rather than 12(b)(1)," *Rent Stabilization,* 5 F.3d at 594, the Supreme Court instructs us that the standing "'inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise.'" *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979) (quoting *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2209, 45 L.Ed.2d 343 (1975)). Indeed, "standing 'is perhaps the most important of [the jurisdictional] doctrines.'" *FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 231, 110 S.Ct. 596, 607, 107

L.Ed.2d 603 (1990) (alteration in original) (quoting *Allen v. Wright*, 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984)). Accordingly, as Judge McCurn correctly noted in a prior opinion analyzing an individual member of an Indian tribe's standing to bring a claim under the Nonintercourse Act, "[t]he concept of standing—*even its prudential dimension*—is a limitation on federal court jurisdiction." *Canadian St. Regis Band of Mohawk Indians v. State of New York*, 573 F.Supp. 1530, 1538 (N.D.N.Y.1983) (emphasis added) (citing *Gladstone, Realtors*, 441 U.S. at 99, 99 S.Ct. at 1607; *Warth*, 422 U.S. at 498, 95 S.Ct. at 2204); *see also National Wildlife Fed'n v. United States*, 626 F.2d 917, 924 n. 13 (D.C.Cir.1980).

■ The established view that standing is at heart "a jurisdictional prerequisite to a federal court's deliberations," *Hodel v. Irving*, 481 U.S. 704, 711, 107 S.Ct. 2076, 2080, 95 L.Ed.2d 668 (1987), is of particular interest to us here, where the County asserts a procedural waiver argument. Specifically, the County contends that Thompson is procedurally barred from making certain arguments on appeal in support of her standing because she failed to raise them in the district court.

Our independent obligation to examine subject matter jurisdiction, *FW/PBS, Inc.*, 493 U.S. at 231, 110 S.Ct. at 607, counsels otherwise.[3] "[W]e are required to address [a standing] issue even if the court[ ] below [has] not passed on it ... and even if the parties fail to raise the issue before us." *Id.* at 230–31, 110 S.Ct. at 607. Our obligation, moreover, extends "to the prudential rules of standing that, apart from Art. III's minimum requirements, serve to limit the role of the courts in resolving public disputes," *Warth*, 422 U.S. at 500, 95 S.Ct. at 2206, and, thus, constitute "self-imposed ... limitations on our jurisdiction." *National Wildlife*, 626 F.2d at 924 n. 13 (appellee's purported waiver of prudential standing challenge is necessarily ineffective because standing implicates federal jurisdiction); *see also Canadian St. Regis Band of Mohawk Indians*, 573 F.Supp. at 1538 (dismissing *sua sponte* plaintiffs' claims for "want of jurisdiction" where individual plaintiffs cannot meet prudential standing requirements under the Nonintercourse Act). The jurisdictional nature of the standing inquiry, therefore, convinces us that we have an independent obligation to examine Thompson's standing under arguments not raised below, in a case such as this one,

**3.** Similarly, we recognize that this obligation creates a corresponding duty to review the district court's implicit threshold determination that the Tax Injunction Act does not preclude federal jurisdiction in this case, an issue that neither party raises on appeal and one which Thompson expressly seeks to waive. In so doing, we are cognizant that the district court considered the jurisdictional impact of the Tax Injunction Act in the context of a motion to remand pursuant to 28 U.S.C. § 1447(c), rather than as a motion to dismiss for lack of subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1). Our authority to review a district court's ruling on a motion to remand for lack of subject matter jurisdiction, however, is limited. *Compare* 28 U.S.C. § 1447(d) (order remanding case to state court for want of federal jurisdiction pursuant to section 1447(c) is not reviewable on appeal) *with* Wright & Miller, § 3740 nn. 12, 19, at 596–97, 599 (and cases cited therein) (denials of remand are reviewable on appeal but may be subject to waiver) *and Sheeran v. General Elec. Co.*, 593 F.2d 93, 97–98 (9th Cir.), *cert. denied*, 444 U.S. 868, 100 S.Ct. 143, 62 L.Ed.2d 93 (1979).

The limits on our power to review the district court's denial of Thompson's motion to remand, however, do not prohibit us from re-

viewing the district court's implicit finding of subject matter jurisdiction over this action. Rather, where a denial of a motion to remand is predicated on a finding of federal jurisdiction, "the issue in subsequent proceedings on appeal is not whether the case was properly removed, but whether the federal district court would have had original jurisdiction of the case had it been filed in that court." *Grubbs v. General Elec. Credit Corp.*, 405 U.S. 699, 702, 92 S.Ct. 1344, 1347, 31 L.Ed.2d 612 (1972). Thus, despite the procedural context in which the jurisdictional issue arises, Thompson's decision to waive review of the district court's denial of her motion to remand pursuant to 28 U.S.C. § 1447(c) does not negate our independent obligation to insure that federal jurisdiction is not extended beyond the limits of Article III, and review is appropriate in this case.

To that end, we agree with the district court that the Tax Injunction Act does not preclude federal jurisdiction in this case. We see no reason to expand on the district court's opinion in light of Judge McCurn's thorough analysis of the issue. *See Thompson*, 1992 WL 554369, at *3–*10. Accordingly, we are satisfied that the Tax Injunction Act does not preclude jurisdiction in this case and proceed to consider the other issues raised on appeal.

where the underlying claims and theories of the action itself remain unchanged from those alleged in the complaint.

▮ Similarly, the standard by which we review dismissals for lack of standing is somewhat murky. We recently stated that "we must modify our standard of review of 12(b)(6) dismissals in the standing context" and "adopt the standard used by several of our sister circuits to review dismissals under 12(b)(1)." *Rent Stabilization*, 5 F.3d at 594. Thus, if the district court based its finding that a party lacks standing on either the complaint alone or the complaint supplemented by undisputed facts gleaned from the record, our review is *de novo. Id.; see also Herbert v. Nat'l Academy of Sciences*, 974 F.2d 192, 197 (D.C.Cir.1992); *Ynclan v. Dep't of Air Force*, 943 F.2d 1388, 1390 (5th Cir. 1991). Conversely, if the district court is obliged to resolve disputed issues of fact in order to determine a party's standing, we accept those factual findings unless they are shown to be "clearly erroneous." *Rent Stabilization*, 5 F.3d at 594. Here, the district court did not resolve any factual disputes. Thus, our review of the district court's dismissal is entirely *de novo. Id.*

Standing, moreover, like other jurisdictional inquiries, "cannot be 'inferred argumentatively from averments in the pleadings,' ... but rather 'must affirmatively appear in the record.'" *FW/PBS, Inc.*, 493 U.S. at 231, 110 S.Ct. at 608 (citations omitted). To that end, "it is the burden of the 'party who seeks the exercise of jurisdiction in his favor,' ... 'clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute.'" *Id.* (citation omitted) (quoting *Warth*, 422 U.S. at 518, 95 S.Ct. at 2215).

When considering a party's standing, we "accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth*, 422 U.S. at 501, 95 S.Ct. at 2206. Additionally, we note that "it is within the [district] court's power to allow or to require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing." *Id.* Thus, if after considering all of the relevant materials, we are

unable to discern a basis for the plaintiff's standing, the complaint must be dismissed.

Finally, we are mindful that "[a]lthough standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal, ... it often turns on the nature and source of the claim asserted." *Id.* at 500, 95 S.Ct. at 2206 (citation omitted). "[T]he source of the plaintiff's claim to relief assumes critical importance with respect to the prudential rules of standing." *Id.* Thus, where, as here, issues of the prudential limitations on standing arise, a plaintiff's standing turns on "whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Id.*

## II.  *Thompson's Standing*

▮ With these principles in mind, we turn now to the issue of whether Thompson has standing to challenge the County's jurisdiction to levy taxes on her Property.

In dismissing Thompson's complaint for lack of standing, the district court characterized her claim as ultimately depending on a finding that the 1816 Conveyance Agreements were invalid under the Nonintercourse Act. Thompson concedes that if her claim ultimately turns on a violation of the Nonintercourse Act, a statute that provides a cause of action only for collective Indian tribes, not the individual members of a tribe, *see United States v. Dann*, 873 F.2d 1189, 1195 (9th Cir.), *cert. denied*, 493 U.S. 890, 110 S.Ct. 234, 107 L.Ed.2d 185 (1989); *James v. Watt*, 716 F.2d 71, 72 (1st Cir.1983), *cert. denied*, 467 U.S. 1209, 104 S.Ct. 2397, 81 L.Ed.2d 354 (1984); *Epps v. Andrus*, 611 F.2d 915, 917–18 (1st Cir.1979); *Mashpee Tribe v. New Seabury Corp.*, 592 F.2d 575, 579 (1st Cir.), *cert. denied*, 444 U.S. 866, 100 S.Ct. 138, 62 L.Ed.2d 90 (1979); *Canadian St. Regis*, 573 F.Supp. at 1535–36, she would lack standing to bring this action. Thompson, however, insists that the district court mischaracterized her action as ultimately depending on a violation of the Nonintercourse Act, because it failed to understand that her claim turns on the fundamental distinction between *title* to property located *within* a reservation and

the jurisdictional boundaries *of* the reservation itself.

Specifically, Thompson argues that the complaint, which never mentions the Nonintercourse Act, challenges the County's taxing power under the theory that it lacks jurisdiction to assess taxes on real property located within "Indian country" as Congress defined that term in 18 U.S.C. § 1151. In support of this theory, the complaint avers that the 1816 Conveyance Agreements granting the State title to lands within the Reservation, the documents relied on by the County for its authority to tax the Property, did nothing to alter the jurisdictional boundaries of the St. Regis Reservation. Instead, those boundaries are defined by the Treaty of 1796 and allegedly have not been diminished. Because the complaint alleges that the 1816 Conveyance Agreements go only to the issue of *title* to land located *within* the boundaries of the St. Regis Reservation, not the issue of the boundaries themselves, Thompson contends the validity of the 1816 Conveyance Agreements are irrelevant to her claim that the County cannot assess taxes on property located *within* the Reservation regardless of who holds title to that property. Thompson notes, moreover, that the validity of *her* own title to the Property in this case depends on the validity of the 1816 Conveyance Agreements. As a result, Thompson argues that it would be ludicrous for her to create a *de facto* challenge to the validity of her own title by challenging the validity of the 1816 Conveyance Agreements under the Nonintercourse Act. Accordingly, Thompson posits that the district court erred in characterizing her claim as ultimately depending on a violation of the Nonintercourse Act and dismissing the complaint for lack of standing thereunder. We agree.

A unanimous Supreme Court instructs that the "cases make clear that a tribal member need not live on a formal reservation to be outside the State's taxing jurisdiction; *it is enough that the member live in 'Indian country.'"* *Oklahoma Tax Comm'n v. Sac & Fox Nation,* —— U.S. ——, ——, 113 S.Ct. 1985, 1991, 124 L.Ed.2d 30 (1993) (emphasis added). When determining whether a local or state authority has taxing power over members of a recognized Indian tribe, therefore, the perimeters of the formal reservation are irrelevant; "[i]nstead, we ask *only* whether the land is Indian country." *Id.* (emphasis added).

Congress defined Indian country "broadly to include formal and informal reservations ... and Indian allotments, whether restricted or held in trust by the United States." *Id.* (citing 18 U.S.C. § 1151). Prior to that statutory definition, "[I]ndian lands were judicially defined to include *only* those lands in which the Indians held some form of property interest." *Solem v. Bartlett,* 465 U.S. 463, 468, 104 S.Ct. 1161, 1165, 79 L.Ed.2d 443 (1984) (emphasis added). In 1948, however, with the enactment of the statutory definition of Indian country, "Congress uncouple[d] reservation status from Indian ownership, and statutorily define[d] Indian country to include lands held in fee by non-Indians *within* reservation boundaries." *Id.* (emphasis added). Thus, the mere conveyance of reservation property to non-Indians does not necessarily disestablish the reservation boundaries for jurisdictional purposes. *See id.; see also Mattz v. Arnett,* 412 U.S. 481, 497, 93 S.Ct. 2245, 2254, 37 L.Ed.2d 92 (1973).[4]

---

4. Thompson and the County spend much time debating whether the boundaries of an Indian reservation can be diminished in the absence of congressional action. Again, the absence or existence of congressional action and its impact on St. Regis Reservation boundaries are issues involving the merits of Thompson's claim. We are cognizant of the proposition articulated by our sister Circuit that:

> diminishment [of reservation boundaries] will not be lightly inferred. *Solem,* 465 U.S. at 472, 104 S.Ct. at 1167. Congress must clearly evince the intent to reduce boundaries, *Rosebud Sioux Tribe v. Kneip,* 430 U.S. 584, 615, 97

S.Ct. 1361, 1377, 51 L.Ed.2d 660 (1977), and traditional solicitude for Indian rights favors the survival of reservation boundaries in the face of the opening up of reservation lands to settlement and entry by non-Indians. *Solem,* 465 U.S. at 472, 104 S.Ct. at 1167.

*Pittsburg & Midway Coal Mining Co. v. Yazzie,* 909 F.2d 1387, 1393 (10th Cir.), *cert. denied,* 498 U.S. 1012, 111 S.Ct. 581, 112 L.Ed.2d 586 (1990). We offer no view, however, as to the application of this proposition in this case. Whether this presumption concerning reservation boundaries applies in the context of a conveyance of reservation property from the tribe to

The district court's dismissal of Thompson's action, however, rests on a contrary premise: that the 1816 Conveyance Agreements conveying to the State the Tribe's title to land located within the boundaries of the Reservation automatically uncoupled that land from the boundaries of the Reservation as originally established by the Treaty of 1796. While we offer no view on the merits of the ultimate issue in this case—whether the 1816 Conveyance Agreements altered the boundaries of the St. Regis Reservation and thereby removed the Property from Indian country—there is nothing in the record before us at this stage in the proceedings to support a finding by the district court that they did.

Viewed from this perspective, the district court's implicit finding, in the context of its standing analysis, that the 1816 Conveyance Agreements diminished the boundaries of the St. Regis Reservation is, at best, premature. Indeed, as her claim is pled in the complaint, a ruling that the 1816 Conveyance Agreements legally diminished the Reservation's boundaries would entitle the County to a judgment on the pure merits of this action. Although the possibility always exists that a ruling on the merits in favor of the County might trigger satellite litigation challenging the validity of the Conveyance Agreements under the Nonintercourse Act, that issue, as Thompson contends, is irrelevant to the disposition of this action. The issue of the territorial boundaries of the St. Regis Reservation, the ultimate issue in this lawsuit and the one for which Thompson seeks an affirmative declaration from the district court, therefore, is best analyzed on the merits, either on a motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6), on cross-motions for summary judgment pursuant to Fed.R.Civ.P. 56, or, if need be, at trial.

Our conclusion that the Nonintercourse Act is irrelevant to Thompson's challenge to the County's taxing power, however, does not end the inquiry into whether she has standing to bring this lawsuit. Indeed, our conclusion that her claim does not depend on a violation of the Nonintercourse Act is in no way dispositive of whether Thompson has standing to challenge the County's taxing authority by seeking a judicial determination of the territorial boundaries of the St. Regis Reservation, a determination that the County contends implicates tribal, rather than individual, rights. In light of our independent obligation to inquire into the standing of litigants to bring actions in the courts below, we proceed to determine whether Thompson has standing to bring this lawsuit.

The County provides no case law for the proposition that prudential limitations on standing require that only tribal representatives be empowered to challenge a local government's jurisdiction to tax where such a challenge implicates a determination of the territorial jurisdiction of an Indian reservation. Instead, the County offers us a prudential standing argument rooted in practical policy concerns. Specifically, the County argues that the determination of reservation boundaries is an issue of paramount importance to entire Indian tribes as well as other governments. The County insists that to allow an individual landowner to seek a judicial determination of an Indian reservation's territorial boundaries, a claim that is inherently tribal in scope, would place established tribal borders in jeopardy, give rise to a series of potentially conflicting determinations, and ultimately disrupt tribal rights across the United States. We disagree.

Thompson seeks a determination that her Property is located within "Indian country," as Congress defined that term pursuant to 18 U.S.C. § 1151.[5] In addition, Thompson challenges the County's authority to tax property located within Indian country under 25

a sovereign state, as is the case here, rather than in the context of the opening up of Indian lands by the federal government to homesteading by private, non-Indian settlers, moreover, is an issue to be decided first in the district court.