14-917-cv
*Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term 2014

(Argued: April 24, 2015          Decided: February 3, 2016)

No. 14-917-cv

_____

ATLANTICA HOLDINGS, INC., ALLAN KIBLISKY, JACQUES GLIKSBERG, BALTICA INVESTMENT HOLDING, INC., BLU FUNDS, INC., ANTHONY KIBLISKY,

*Plaintiffs-Appellees,*

-v.-

SOVEREIGN WEALTH FUND SAMRUK-KAZYNA JSC, A/K/A NATIONAL WELFARE FUND SAMRUK-KAZYNA,

*Defendant-Appellant.*

_____

Before:      WESLEY, LIVINGSTON, and CHIN, *Circuit Judges*.

Defendant, a Kazakhstani sovereign wealth fund that allegedly misled Plaintiffs regarding the value of its subsidiary's securities in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, appeals from a March 10, 2014 order of the United States District Court for the Southern District of New York (Jesse M. Furman, *Judge*) denying its motion to dismiss based on sovereign immunity and lack of personal jurisdiction.    The district court concluded that Defendant is not immune under the Foreign Sovereign

Immunities Act of 1976's ("FSIA's") commercial-activity exception, and that the FSIA authorizes personal jurisdiction over Defendant. On appeal, Defendant argues that the district court erred in rejecting its claim of sovereign immunity and in neglecting to analyze whether exercising personal jurisdiction over it would comport with due process. We affirm the district court's sovereign immunity holding and decline to exercise jurisdiction over Defendant's personal jurisdiction challenge.

AFFIRMED IN PART, DISMISSED IN PART.

JOSEPH D. PIZZURRO (Jonathan J. Walsh, Kevin A. Meehan, *on the brief*), Curtis, Mallet-Prevost, Colt & Mosle LLP, New York, NY, *for Defendant-Appellant*.

BRETT D. JAFFE (Jennifer S. Kozar, James S. D'Ambra, Jr., *on the brief*), Alston & Bird LLP, New York, NY, *for Plaintiffs-Appellees*.

DEBRA ANN LIVINGSTON, *Circuit Judge*:

This interlocutory appeal presents a question of first impression: whether the Foreign Sovereign Immunities Act of 1976 ("FSIA"), Pub. L. No. 94-583, 90 Stat. 2891, immunizes an instrumentality of a foreign sovereign against claims that it violated federal securities laws by making misrepresentations outside the United States concerning the value of securities purchased by investors within the United States. Plaintiffs-Appellees Atlantica Holdings, Inc. ("Atlantica"); Baltica Investment Holding, Inc. ("Baltica"); Blu Funds, Inc. ("Blu Funds"); Allan

2

and Anthony Kiblisky (the "Kibliskys"); and Jacques Gliksberg ("Gliksberg") (collectively, "Plaintiffs") brought this action in the United States District Court for the Southern District of New York, alleging that Defendant-Appellant Sovereign Wealth Fund Samruk-Kazyna JSC ("SK Fund"), a sovereign wealth fund of the Republic of Kazakhstan, misrepresented the value of certain notes (the "Subordinated Notes") issued by non-party BTA Bank JSC ("BTA Bank"), a Kazakhstani corporation majority-owned by SK Fund, in connection with a 2010 restructuring of BTA Bank's debt. Plaintiffs seek to hold SK Fund liable for these misrepresentations under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), Pub. L. No. 73-291, 48 Stat. 881 (codified in relevant part at 15 U.S.C. §§ 78j(b), 78t(a)).

The district court (Jesse M. Furman, *Judge*) held that the FSIA furnished both subject-matter jurisdiction over Plaintiffs' claims and personal jurisdiction over SK Fund, and therefore denied SK Fund's motion to dismiss. We agree with the district court that SK Fund is not immune from suit under the FSIA because Plaintiffs' claims are "based upon . . . an act outside the territory of the United States" that "cause[d] a direct effect in the United States." 28 U.S.C. § 1605(a)(2). We further decline to exercise appellate jurisdiction to consider SK Fund's

argument that the district court could not exercise personal jurisdiction over it consistent with due process.  Accordingly, we affirm the appealed-from order in part and dismiss the balance of SK Fund's appeal.

**BACKGROUND[1]**

SK Fund, a joint-stock company wholly owned by the government of the Republic of Kazakhstan, is the majority owner of BTA Bank, a Kazakhstani corporation.  In February 2009, SK Fund acquired 75.1% of BTA Bank's common stock by making a $1.5 billion investment in the bank.  Shortly thereafter, in April 2009, BTA Bank announced that it had ceased principal payments on all of its outstanding financial obligations.  Atlantica and Baltica, each a Panamanian investment fund, were creditors of BTA Bank, having purchased certain of its outstanding debt securities.  These securities could only be held in accounts maintained in specific clearing systems, access to which is generally limited to large financial institutions ("Direct Participants").  However, Direct Participants could hold BTA Bank securities for either their own account or their customers'

---

[1] The facts in this section are drawn from Plaintiffs' amended complaint as well as affidavits submitted by SK Fund in connection with its motion to dismiss.  *See Robinson v. Gov't of Malaysia*, 269 F.3d 133, 140 n.6 (2d Cir. 2001).

benefit.  Atlantica and Baltica were customers of UBS Financial Services ("UBS"), a large financial institution that was evidently a Direct Participant.

After ceasing to make principal payments on its outstanding securities, BTA Bank undertook a restructuring of its capital structure in 2010 (the "2010 Restructuring").  In connection with the 2010 Restructuring, BTA Bank issued a 600-plus-page information memorandum (the "Information Memorandum") that incorporated by reference a deed of undertaking executed by SK Fund (the "Deed of Undertaking").  The Information Memorandum was made available to BTA Bank's existing creditors on its website.  An individual seeking to access the document was required to certify that he or she (1) was located outside the United States and was not a resident of the United States, i.e., not  a "U.S. person"; or (2) was an "accredited investor," as defined in Rule 501(a) of SEC Regulation D, 17 C.F.R. § 230.501(a), or a "qualified institutional buyer" ("QIB"), as defined in SEC Rule 144A, 17 C.F.R. § 230.144A.  J.A. 161.  According to Plaintiffs, SK Fund's "dominance of and control over BTA Bank, . . . and the inclusion in the Information Memorandum of certain statements from S-K Fund by reference establish that S-K Fund was involved in the production of the Information Memorandum and was aware of its contents."  J.A. 47.

The Information Memorandum described the terms of the 2010 Restructuring. SK Fund would receive additional equity in BTA Bank, becoming an 80% owner. Preexisting holders of BTA Bank's debt would receive, in exchange for their old securities, new ones, including the Subordinated Notes. Like BTA Bank's old securities, the new ones issued in connection with the 2010 Restructuring could be held only by Direct Participants. Again, however, Direct Participants could hold the new securities either for their own accounts or for their customers' benefit. The new securities were subject to transfer restrictions. In particular, because they would not be registered under United States securities laws, they could be transferred only to non–U.S. persons or QIBs in transactions exempt from this country's registration requirements. *See* 1 Louis Loss et al., *Fundamentals of Securities Regulation* 582–83 (6th ed. 2011). Interests in the new securities could be transferred on the books of a Direct Participant, but such transfers were subject to the same restrictions.

As required for the 2010 Restructuring to become effective, it was initially approved by BTA Bank's creditors in May 2010 and then by a court in Kazakhstan in July 2010. As creditors, Atlantica and Baltica committed to participate in the 2010 Restructuring—i.e., to accept Subordinated Notes in

6

exchange for their existing securities—by communicating with their broker in the Miami office of UBS. Atlantica and Baltica later acquired additional Subordinated Notes on the secondary market between September 2010 and October 2012, and the other Plaintiffs, who had not previously been creditors of BTA Bank, acquired Subordinated Notes on the secondary market as well: Blu Funds made its investment in April 2012, the Kibliskys made theirs in January 2011, and Gliksberg made several purchases between September 2010 and May 2011. Blu Funds, like Atlantica and Baltica, is a Panamanian investment fund; the Kibliskys live in Miami, and Gliksberg lives in Highland Park, Illinois.

Plaintiffs' secondary-market purchases were all made through UBS's Miami office, which sent Plaintiffs' orders to its broker-dealer in New York using funds from Plaintiffs' UBS accounts. The orders were filled, and the transactions completed, in New York. Plaintiffs allege that BTA Bank and SK Fund marketed the Subordinated Notes "extensively in the United States, and directed that marketing to U.S. investors," J.A. 44; in particular, the complaint avers that SK Fund sent representatives to the United States, in the district court's words, "to meet with investors and to assure them of the health of BTA Bank's balance sheet." *Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 2 F.

7

Supp. 3d 550, 554 (S.D.N.Y. 2014). These efforts were successful, according to Plaintiffs: a BTA Bank PowerPoint presentation from January 2012 indicates that United States investors held 17% of the Subordinated Notes.

Plaintiffs claim to have made their investments in the Subordinated Notes in reliance on a number of misrepresentations contained in the Information Memorandum and made subsequently by SK Fund and BTA Bank. Principally, the Information Memorandum—including the portion describing the obligations undertaken by SK Fund in the Deed of Undertaking—stated that BTA Bank would not pay SK Fund any dividends on its equity holdings until the bank's newly issued securities, including the Subordinated Notes, were paid in full. This representation, in addition to other financial disclosures in the Information Memorandum, was allegedly false in light of a complex, undisclosed series of transactions between BTA Bank and SK Fund (the "Negative Carry Swap") pursuant to which BTA Bank paid interest on SK Fund deposits at a rate significantly higher than BTA Bank was earning on bonds it had purchased from SK Fund. According to Plaintiffs, the Negative Carry Swap resulted in SK Fund's effectively "siphon[ing] hundreds of millions of dollars from BTA Bank at the expense of other creditors." J.A. 20–21.

8

The Negative Carry Swap began to come to light in May 2011, when BTA Bank issued an investor presentation disclosing that it was paying more on its liabilities than it was taking in on its assets, and when the investment bank J.P. Morgan published a research report disclosing additional details of BTA Bank's asset-liability yield mismatch. As a result of these disclosures, the value of the Subordinated Notes decreased to less than 40% of face value by June 2011, and then to less than 10% of face value by January 2012.

Between July 2011 and December 2011, following the initial round of disclosures regarding the Negative Carry Swap, high-ranking SK Fund officers made a number of public statements to American press outlets, including *Bloomberg*, seeking to "prop up" the value of BTA Bank's securities by assuring investors that SK Fund would guarantee BTA Bank's ongoing viability. J.A. 53–54. Plaintiffs allege that these statements, too, were false or misleading: BTA Bank eventually defaulted on its debt in January 2012, less than eighteen months after the 2010 Restructuring. BTA Bank then went through a second restructuring (the "2012 Restructuring"), pursuant to which SK Fund gained a 97% ownership interest in the bank.

Plaintiffs allege that BTA Bank made additional false or misleading statements in 2012, after its default. In PowerPoint presentations prepared in connection with the 2012 Restructuring, BTA Bank failed to disclose its liability on instruments called "recovery units," which it had issued to some creditors during the 2010 Restructuring. These recovery units entitled holders to participate pari passu with BTA Bank's senior creditors in the event that the bank defaulted. When the market eventually learned of these previously undisclosed senior liabilities, the value of the Subordinated Notes held by Plaintiffs plunged even further.

Plaintiffs commenced this action in the United States District Court for the Southern District of New York on December 5, 2012, and filed an amended complaint (the "complaint") on April 4, 2013. The complaint asserts claims under Sections 10(b) and 20(a) of the Exchange Act against SK Fund; because BTA Bank was bankrupt at the time, Plaintiffs did not sue BTA Bank, although they later brought a separate action against it, which is now also before Judge Furman in the Southern District. On May 6, 2013, SK Fund moved to dismiss the complaint in its entirety for lack of subject-matter jurisdiction under the FSIA,

10

lack of personal jurisdiction, failure to state a claim, and failure to plead fraud with particularity.

On March 10, 2014, the district court issued an opinion denying the bulk of SK Fund's motion. *Atlantica Holdings*, 2 F. Supp. 3d 550. With respect to the FSIA, the district court held that it had subject-matter jurisdiction under both the first and third clauses of the statute's "commercial-activity exception," which provide, respectively, that a foreign state is not immune from suit in actions "based upon" the state's commercial activity in the United States or in actions "based upon" its commercial activity outside the United States that has a "direct effect" in the United States. 28 U.S.C. § 1605(a)(2). In a footnote, the district court concluded that because the FSIA authorizes personal jurisdiction over a foreign state whenever it is not immune from suit, *see* 28 U.S.C. § 1330(b), the conclusion that SK Fund was not immune under the FSIA's commercial-activity exception also meant that the district court could exercise personal jurisdiction over SK Fund. *See Atlantica Holdings*, 2 F. Supp. 2d at 559 n.5.

With respect to the merits of Plaintiffs' claims, the district court concluded that Plaintiffs (1) had adequately alleged a domestic securities transaction under *Morrison v. National Australia Bank*, 561 U.S. 247 (2010), and *Absolute Activist Value*

11

*Master Fund Ltd. v. Ficeto*, 677 F.3d 60 (2d Cir. 2012), and (2) had adequately alleged reasonable reliance on SK Fund's alleged misstatements and omissions. *See Atlantica Holdings*, 2 F. Supp. 3d at 559–62.  However, because only Blu Funds and Atlantica had purchased Subordinated Notes after July 2011, the other Plaintiffs could not have relied on any statements from July 2011 or later in deciding to invest; accordingly, the district court dismissed those Plaintiffs' claims related to those statements.  *Id.* at 562.[2]  The court also rejected SK Fund's arguments that Plaintiffs had not adequately alleged loss causation, had failed to plead scienter with particularity, and had not adequately alleged control-person liability under Section 20(a) of the Exchange Act.  *Id.* at 563.

The denial of a motion to dismiss on sovereign immunity grounds is an immediately appealable collateral order, *see Rogers v. Petroleo Brasileiro, S.A.*, 673 F.3d 131, 136 (2d Cir. 2012), and SK Fund filed a timely notice of appeal from the district court's order on March 25, 2014.  SK Fund also sought a certificate of appealability pursuant to 28 U.S.C. § 1292(b) with respect to the district court's

[2] The district court opinion states broadly that "[t]o the extent the Amended Complaint can be read to state claims arising out of statements in 2011 or later on behalf of Baltica and the individual plaintiffs, therefore, such claims are dismissed."  *Id*. at 562.  The complaint alleges misstatements by SK Fund in 2011 beginning only in July of that year, after the purchases by the Kibliskys and Gliksberg, the last of which occurred in January and May 2011, respectively.

*Morrison* holding, which the district court granted on May 9, 2014. *Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, No. 12-cv-8852, 2014 WL 1881075 (S.D.N.Y. May 9, 2014). On July 28, 2014, however, a panel of this Court denied leave to appeal the *Morrison* issue. In light of that decision, the only issues argued by the parties on appeal are (1) whether the FSIA immunizes SK Fund against Plaintiffs' claims and (2) whether the district court may properly exercise personal jurisdiction over SK Fund.

**DISCUSSION**

**I.**

The FSIA "provides the 'sole basis' for obtaining jurisdiction over a foreign sovereign in the United States." *Republic of Argentina v. Weltover*, 504 U.S. 607, 611 (1992) (quoting *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434–39 (1989)). Under the FSIA, a "foreign state" is "immune from the jurisdiction" of state and federal courts in the United States unless one of a number of statutory exceptions applies. 28 U.S.C. § 1604; *see id.* §§ 1605–1607 (providing exceptions). Federal courts have subject-matter jurisdiction over an action against a foreign state if, and only if, one of those exceptions applies. *Id.* § 1330(a). Here, Plaintiffs concede that SK Fund qualifies as a foreign state for

FSIA purposes. *See id.* § 1603(a) (providing that an "agency or instrumentality" of a foreign state is a "foreign state"); *id.* § 1603(b) (providing that a majority-owned corporation formed under the laws of the foreign state is an "agency or instrumentality" of a foreign state). Therefore, the question whether the district court had subject-matter jurisdiction depends on whether one of the FSIA's exceptions to immunity applies.

"The single most important exception to foreign state immunity under the FSIA," *Hanil Bank v. P.T. Bank Negara Indon. (Persero)*, 148 F.3d 127, 130 (2d Cir. 1998), and the only one at issue in this case, is the commercial-activity exception. This exception, which contains three independent clauses, provides that a foreign state is not immune from jurisdiction "in any case" in which:

> the action is based [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2). Plaintiffs argue, and the district court held, that SK Fund is not immune from jurisdiction because both the first and third clauses of the commercial-activity exception apply in this case. *See Atlantica Holdings*, 2 F. Supp. 3d at 557–59. Because we agree with Plaintiffs and the district court that

14

the third clause applies, we do not reach the parties' arguments regarding the first clause.

The third clause of the commercial-activity exception is known as the "direct-effect clause." Under the direct-effect clause, a foreign state is not immune from jurisdiction if the plaintiff's "lawsuit is (1) 'based upon . . . an act outside the territory of the United States'; (2) that was taken 'in connection with a commercial activity' of [the foreign state] outside this country; and (3) that 'cause[d] a direct effect in the United States.'" *Weltover*, 504 U.S. at 611 (first and third alterations in original) (quoting 28 U.S.C. § 1605(a)(2)). SK Fund primarily argues (1) that the district court misperceived what Plaintiffs' claims are "based upon," and (2) that the actions upon which Plaintiffs' claims are actually based did not "cause[] a direct effect in the United States." We address these two arguments in turn. Because the district court based its decision on undisputed facts drawn from Plaintiffs' complaint and SK Fund's evidentiary submissions, our review is de novo. *See Virtual Countries, Inc. v. Republic of South Africa*, 300 F.3d 230, 235 (2d Cir. 2002).

15

**A.**

The Supreme Court has explained that, within the meaning of § 1605(a)(2), "an action is 'based upon' the 'particular conduct' that constitutes the 'gravamen' of the suit." *OBB Personenverkehr AG v. Sachs*, 136 S. Ct. 390, 396 (2015) (quoting *Saudi Arabia v. Nelson*, 507 U.S. 349, 357 (1993)).[3] "Rather than individually analyzing each of the [Plaintiffs'] causes of action, we zero[] in on the core of their suit . . . ." *Id*. *Sachs*, handed down just this Term, describes the "gravamen" as the "basis" or "foundation" of a claim, i.e., "those elements . . . that, if proven, would entitle a plaintiff to relief." *Id*. at 395 (quoting *Nelson*, 507 U.S. at 357). Thus, suits for personal injuries sustained at a railway station in Austria, *see id.* at 396, or in a prison in Saudi Arabia, *see Nelson*, 507 U.S. at 352-54, 358, rest on conduct that "plainly occurred abroad." *Sachs*, 136 S. Ct. at 396. In this case, identifying the "gravamen" of Plaintiffs' complaint is straightforward. Plaintiffs' core claim is that they were misled as to the value of the Subordinated Notes by certain misrepresentations made by SK Fund and BTA Bank. So the gravamen of Plaintiffs' complaint is those misrepresentations. *See Black's Law Dictionary* 817

---

[3] We have applied *Nelson*'s understanding of § 1605(a)(2)'s "based upon" requirement in the context of the third clause of that provision. *See Kensington Int'l Ltd. v. Itoua*, 505 F.3d 147, 155 (2d Cir. 2007).

(10th ed. 2014) (defining "gravamen" as "[t]he substantial point or essence of a claim, grievance, or complaint").

SK Fund disputes whether statements made by BTA Bank in investor presentations and in the Information Memorandum may properly be attributed to it for jurisdictional purposes. *See First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 623-28 (1983) (establishing presumption that "government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such"). To be sure, Plaintiffs seeking jurisdiction under the FSIA must allege facts sufficient to establish an exception to sovereign immunity under the FSIA. *See Robinson*, 269 F.3d at 140-41. In this case, however, insofar as BTA Bank's statements constitute part of the "gravamen" of the complaint, Plaintiffs have advanced a Section 20(a) "control person" theory which, if proven, "would entitle [them] to relief" from SK Fund on the basis of BTA Bank's alleged misrepresentations. *Sachs*, 136 S. Ct. at 395; *see* 15 U.S.C. § 78t(a) (holding liable any person "who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder"). The district court rejected SK Fund's

17

challenge to the sufficiency of Plaintiffs' Section 20(a) "control" allegations in a portion of its ruling not before us on appeal.

Thus, we need not reach the question whether Plaintiffs have shown that BTA Bank is SK Fund's "alter ego," *see U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, 199 F.3d 94, 98 (2d Cir. 1999) (per curiam) ("Under certain circumstances, the acts of a state's 'alter ego' may be attributed to the state in determining whether § 1605(a)(2) applies."), so as to recover under their Section 10(b) theory.  *See* 17 C.F.R. § 240.10b-5(b) (holding liable any person who "make[s] any untrue statement of material fact"); *Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2301 (2011) (reiterating Section 10(b)'s requirement that defendant "make" the actionable misrepresentation).  *Sachs* makes clear that in assessing whether an action is "based upon" acts outside the United States, for FSIA purposes, we look not to the analysis of each individual claim, but to the overall question where a lawsuit's *foundation* is geographically based.  *See Sachs*, 136 S. Ct. at 396 ("[In *Nelson*,] we did not undertake such an exhaustive claim-by-claim, element-by-element analysis of [Plaintiffs'] 16 causes of action, nor did we engage in the choice-of-law analysis that would have been a necessary prelude to

18

such an undertaking."). And here, the parties agree that all the misrepresentations at issue occurred outside the United States.

For these reasons, we conclude that Plaintiffs' claims against SK Fund are "based upon" (at least) the misrepresentations alleged in their complaint.[4] SK Fund does not dispute that those misrepresentations were made outside the United States. *See* Appellant's Br. at 14 ("Plaintiffs cite certain statements made by BTA Bank and SK Fund *in Kazakhstan* . . . .") (emphasis added). Nor does SK Fund dispute that they were made in connection with a commercial activity of SK Fund outside this country. Accordingly, this action is "based upon . . . an act outside the territory of the United States in connection with a commercial activity of [SK Fund] elsewhere," and the only question remaining is whether "that act cause[d] a direct effect in the United States." 28 U.S.C. § 1605(a)(2).

**B.**

Plaintiffs argue, and the district court held, that losses suffered by United States investors in the Subordinated Notes as a result of SK Fund's alleged

---

[4] The district court identified other acts that Plaintiffs' claims are "based upon," and SK Fund raises several objections to this portion of the court's analysis. We do not reach these objections given our conclusions (1) that this action is based upon (at least) the misrepresentations alleged in the complaint, and (2) that those misrepresentations had a "direct effect" in the United States. *See infra* section I.B.

19

misrepresentations about those securities' value qualify as a "direct effect" in this country. *See Atlantica Holdings*, 2 F. Supp. 3d at 558. We agree.

**1.**

In order to be "direct," an effect need not be "substantial" or "foreseeable," but rather must simply "follow[] 'as an immediate consequence of the defendant's . . . activity.'" *Weltover*, 504 U.S. at 618 (second alteration in original) (quoting *Weltover, Inc. v. Republic of Argentina*, 941 F.2d 145, 152 (2d Cir. 1991)). In *Weltover*, the Supreme Court held that Argentina's nonpayment of funds into a New York bank account that had been designated as the place of payment on certain bonds issued by that country caused a direct effect in the United States because "[m]oney that was supposed to have been delivered to [the] New York bank for deposit was not forthcoming." 504 U.S. at 619. Based on *Weltover*'s holding, courts have consistently held that, in contract cases, a breach of a contractual duty causes a direct effect in the United States sufficient to confer FSIA jurisdiction so long as the United States is the place of performance for the breached duty. *See, e.g., Rogers*, 673 F.3d at 139–40; *Hanil Bank*, 148 F.3d at 132; *Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 241 (2d Cir. 1994); *see also Odhiambo v. Republic of Kenya*, 764 F.3d 31, 40 (D.C. Cir. 2014).

20

Here, of course, Plaintiffs are asserting tort claims, not contract claims. "In tort," we have reasoned, "the analog to contract law's place of performance is the locus of the tort." *Antares Aircraft, L.P. v. Federal Republic of Nigeria*, 999 F.2d 33, 36 (2d Cir. 1993). A tort's locus—also known as the *locus delicti*, or "place of wrong"[5]—is the place "where the last event necessary to make an actor liable for an alleged tort takes place." Restatement of Conflict of Laws § 377 (1934) [hereinafter First Restatement]. And, "[s]ince a tort action traditionally has not been viewed as complete until the plaintiff suffers injury or loss," the cause of action has generally "been considered to arise at the place where this damage was sustained." *Sack v. Low*, 478 F.2d 360, 365 (2d Cir. 1973); *see, e.g.*, Christopher

---

[5] Traditionally, identifying a tort's locus has been important primarily in choice-of-law analysis, where the rule of *lex loci delicti* held that "tort liability is governed . . . by the law of the place where the alleged tort was committed." *Vanity Fair Mills, Inc. v. T. Eaton Co.*, 234 F.2d 633, 639 (2d Cir. 1956). Most jurisdictions' choice-of-law rules have, over the last half-century, abandoned this "bright-line" rule "in favor of more subtle and flexible inquiries" aimed at identifying the forum with the most significant connection to the parties' dispute. *Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 220 (2d Cir. 2014) (Leval, J., concurring); *compare, e.g.*, Restatement of Conflict of Laws §§ 377–390 (1934), *with* Restatement (Second) of Conflict of Laws § 145 (1971). However, the fact that choice-of-law rules no longer depend entirely on the locus of the tort does not alter our task in this FSIA case, which is to determine whether SK Fund's alleged misrepresentations caused a direct effect in the United States. Regardless of trends in choice-of-law doctrine, it has remained the case that, for FSIA purposes, we have found a direct effect (at least) at "the locus of the tort." *Antares Aircraft*, 999 F.2d at 36. We therefore draw on the body of law developed primarily under the *lex loci delicti* rule in order to identify the locus of SK Fund's alleged misrepresentations.

A. Whitlock, *Myth of Mess? International Choice of Law in Action*, 84 N.Y.U. L. Rev. 719, 724–25 (2009) ("The First Restatement defines the place of wrong as 'the state where the last event necessary to make an actor liable for an alleged tort takes place.' Usually this is the location where the plaintiff was injured, since liability does not arise without injury." (footnotes omitted) (quoting First Restatement § 377)). Thus, a determination that a tort's locus is the United States is, in effect, often a determination that the plaintiff has been injured in this country by the defendant's tortious actions—meaning that those actions caused a "direct effect" (the plaintiff's injury) in this country. As a result, such a determination will ordinarily be sufficient, if not invariably necessary, to confer FSIA jurisdiction under our precedents. *See Antares Aircraft*, 999 F.2d at 36 (leaving open the possibility that even "a foreign tort may have had sufficient contacts with the United States to establish the requisite 'direct effect' in this country"); *see also Hanil Bank*, 148 F.3d at 133 (noting that the United States "need not be the location where the *most* direct effect is felt, simply *a* direct effect").

We have previously held that the locus of an alleged misrepresentation actionable under Section 10(b) is the forum "where the loss is sustained, not where fraudulent misrepresentations are made." *Sack*, 478 F.2d at 365 (quoting

22

First Restatement § 377 note 4). In *Sack*, the defendants to a Section 10(b) claim argued that it was time-barred. At the time, there was no federal statute of limitations for such claims, so courts looked to the law of the forum state—in that case, New York. New York's "borrowing statute" provides that claims arising in another state are governed by that state's statute of limitations if it is shorter than New York's. *See* N.Y.C.P.L.R. § 202. The *Sack* defendants argued that the plaintiffs' claim arose in Massachusetts, raising the question of where a Section 10(b) claim arises. In answer, Judge Friendly looked to the First Restatement to identify the locus of "a cause of action for fraud or deceit, the closest common law analogy to an action under [Section 10(b)]." 478 F.2d at 365. The First Restatement provides that the locus of a fraud claim is the place where the plaintiff sustains a loss. *Id.* at 365–66; *accord, e.g.*, *In re Thelen LLP*, 736 F.3d 213, 220 (2d Cir. 2013). In particular, the First Restatement contains an illustration for securities-fraud claims that Judge Friendly deemed "quite pertinent":

> 6. A, in state X, owns shares in the M company. B, in state Y, fraudulently persuades A not to sell the shares. The value of the shares falls. The place of wrong is X.

*Sack*, 478 F.2d at 366 (quoting First Restatement § 377 note 4). On this basis, the *Sack* Court held that an alleged misrepresentation actionable under Section

23

10(b)—just like a claim for common-law fraud—arises "where its economic impact is felt, normally the plaintiffs' residence." *Id.*; *see also Block v. First Blood Assocs.*, 988 F.2d 344, 349 (2d Cir. 1993) (relying on *Sack*'s holding to conclude that a Section 10(b) claim arose in the forum where the plaintiffs resided).

If the locus of a Section 10(b) claim is the place where the plaintiff suffers economic loss from reliance on the defendant's misrepresentations, then it follows that in a securities fraud case, an FSIA direct effect may be felt where the plaintiff suffers such loss. *See Antares Aircraft*, 999 F.2d at 36 ("In tort, the analog to contract law's place of performance is the locus of the tort."). To be sure, locating an economic injury within the United States, without more, will not suffice to bring a foreign sovereign within the "commercial activities" exception. *See id.* ("[T]he fact that an American individual or firm suffers some financial loss from a foreign tort cannot, standing alone, suffice to trigger the exception.").[6] But here, as the district court correctly determined, Plaintiffs have adequately

[6] In contrast, as indicated earlier, where an economic injury is more than the mere loss to an American individual or firm from a foreign tort—where the economic injury is itself the "last event necessary to make the actor liable for the alleged tort," thus locating the tort within the United States, *see* First Restatement § 377—the connection between the foreign sovereign's act and its effects may often, if not invariably, be "direct."

shown that SK Fund "contemplated investment by United States persons" and that SK Fund's alleged misrepresentations caused a direct effect in the United States when at least some investors in the Subordinated Notes—including Gliksberg and the Kibliskys—suffered an economic loss in this country as a result of those misrepresentations. *See Atlantica Holdings*, 2 F. Supp. 3d at 558 ("[A]ccording to the Amended Complaint, Defendant made a series of false or misleading statements about the financial health of BTA Bank that, when the dust settled, left holders of the Notes—including many United States investors— with assets worth less than ten percent of their face value."). On such facts, we have no difficulty concluding that Plaintiffs' loss "follow[ed] as an immediate consequence" of SK Fund's alleged misrepresentations concerning securities that were marketed in the United States and directed toward United States persons. *Weltover*, 504 U.S. at 618 (internal quotation marks omitted).

As noted, Plaintiffs' amended complaint alleges that the Kibliskys reside in Miami and that Gliksberg resides in Illinois. Plaintiffs allege that Gliksberg and the Kibliskys purchased Subordinated Notes following the 2010 Restructuring in reliance on the Information Memorandum, which allegedly included a number of misrepresentations about the value of the Subordinated Notes. They made

these purchases by placing orders through their broker in the Miami office of UBS. After the falsity of SK Fund's alleged misstatements was revealed, "the Subordinated Notes lost substantially all of their value." J.A. 61. Nothing in the amended complaint or the parties' other submissions suggests that Gliksberg and the Kibliskys were injured by SK Fund's alleged misstatements anywhere other than their place of residence. The locus of SK Fund's alleged securities fraud, then, was the United States. *See Sack*, 478 F.2d at 366; First Restatement § 377 note 4. And the fact that the locus of the fraud was the United States means (at least in circumstances where the securities were also marketed here and, as the district court noted, the defendant contemplated and acted to encourage investment by United States persons) the direct-effect clause is satisfied. *See Antares Aircraft*, 999 F.2d at 36.

**2.**

SK Fund advances three primary arguments against our conclusion, none of which is persuasive.

First, SK Fund emphasizes that the Plaintiffs other than Gliksberg and the Kibliskys are not American, and therefore could not have been injured in the United States by SK Fund's alleged misrepresentations. The import of this

26

argument is not entirely clear; perhaps SK Fund means to suggest that FSIA immunity must be overcome on a plaintiff-by-plaintiff basis, so that even if SK Fund's misrepresentations had a direct effect on Gliksberg and the Kibliskys in the United States, the other Plaintiffs' claims would have to be dismissed. Regardless, the premise of SK Fund's argument—that Plaintiffs must demonstrate a direct effect *on themselves* in the United States to overcome FSIA immunity—is incorrect; the FSIA requires only that SK Fund's alleged misrepresentations had a direct effect *in* the United States. In other words, had all of the Plaintiffs been foreigners, they could have successfully premised FSIA jurisdiction on the effect that SK Fund's alleged misrepresentations had on non-party United States investors, provided that Plaintiffs could adequately establish the existence of United States investors so affected. *Cf. Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 489 (1983) (noting that the FSIA "allow[s] a foreign plaintiff to sue a foreign sovereign in the courts of the United States, provided the substantive requirements of the Act are satisfied").

This conclusion—that an FSIA plaintiff need only show a direct effect on someone in the United States, plaintiff or not—follows directly from the text of the direct-effect clause, which provides that a foreign state is not immune from

27

jurisdiction where the "action is based . . . upon an act outside the territory of the United States . . . and *that act causes a direct effect* in the United States." 28 U.S.C. § 1605(a)(2) (emphasis added). Simply put, the statute says that the act on which the plaintiff's claims are based must have had a domestic effect, not that the plaintiff's claims must be based upon the act's domestic effect. Our case law, moreover, confirms this understanding of the FSIA's text. In *Rafidain Bank*, 15 F.3d 238, a Kuwaiti bank sued two Iraqi banks for breaching certain loan agreements. This Court found jurisdiction under the direct-effect clause based on the defendants' non-payment of funds into the United States, even though "the United States [was] not the place of performance of any contractual obligations owed to [the] plaintiff" because "the payments were to be made not directly to [the plaintiff] but to New York bank accounts held by the lead banks of the various lending syndicates" in which the plaintiff participated. *Id.* at 239. We explained that "[t]he focus of § 1605(a)(2) is the activity of the sovereign," not the location of the plaintiff: "If the sovereign's activity is commercial in nature and has a direct effect in the United States, then the jurisdictional nexus is met, no immunity attaches, and a district court has the authority to adjudicate disputes based on that activity." *Id.* at 241. For these reasons, the fact that

28

Plaintiffs here have shown a direct effect on Gliksberg and the Kibliskys in the United States is more than sufficient to satisfy the direct-effect clause with respect to Plaintiffs' entire lawsuit.

Next, SK Fund suggests that a financial loss to American investors cannot qualify as a direct effect for FSIA purposes. We reject this argument, which rests on a misreading of our direct-effect precedents. In contract cases, FSIA jurisdiction is often premised on a financial loss, *see, e.g.*, *Weltover*, 504 U.S. at 619 ("Money that was supposed to have been delivered to a New York bank for deposit was not forthcoming."), and tort cases are no different.

To be sure, we have said that "the fact that an American individual or firm suffers some financial loss from a *foreign tort* cannot, standing alone, suffice to trigger" the FSIA's direct-effect clause. *Antares Aircraft*, 999 F.2d at 37 (emphasis added). Thus, where an American citizen suffered a personal injury abroad at the hands of a foreign state and returned to this country permanently disabled, we held that his ongoing disability was not a direct effect of the foreign state's actions, given that his initial injury occurred abroad. *See Martin v. Republic of South Africa*, 836 F.2d 91, 95 (2d Cir. 1987); *accord, e.g.*, *Princz v. Federal Republic of Germany*, 26 F.3d 1166, 1173 (D.C. Cir. 1994) ("The lingering effects of a personal

injury suffered overseas cannot be sufficient to satisfy the direct effect requirement of the FSIA."); *see also* First Restatement § 377 note 1 ("[W]hen a person sustains bodily harm, the place of wrong is the place where the harmful force takes effect upon the body."). Similarly, where an American firm's airplane was detained by a foreign state in that state's own territory, we held that the resulting financial damage to the firm in the United States was not a direct effect, since the "locus of the tort"—the place where the airplane was detained—was in a foreign country. *Antares Aircraft*, 999 F.2d at 36; *accord, e.g.*, *Westfield v. Federal Republic of Germany*, 633 F.3d 409, 416–17 (6th Cir. 2011) (holding that the Third Reich's conversion of plaintiff's art in Germany did not have a direct effect in the United States); *cf.* First Restatement § 377 note 3 ("When harm is caused to land or chattels, the place of wrong is the place where the force takes effect on the thing."). And, where an American citizen was allegedly defrauded by a foreign state in its own territory, we held that her being forced to live in "much reduced circumstances" upon returning to the United States was not a direct effect; in that case, too, the plaintiff's initial injury was suffered—and the alleged tort itself was therefore completed—outside this country's borders. *Guirlando v. T.C. Ziraat Bankasi A.S.*, 602 F.3d 69, 79 (2d Cir. 2010).

30

But in all of those cases, unlike in this one, the initial injury caused by the defendant's allegedly tortious conduct occurred in a foreign country, not in the United States—that is, those cases all involved "foreign tort[s]." *Antares Aircraft*, 999 F.2d at 36. This distinction is critical. Where an American plaintiff is injured abroad, it will often be easy for the plaintiff to cite some downstream financial harm suffered in the United States (where the plaintiff lives or is headquartered), and in those circumstances, courts must take care to distinguish the initial injury caused by the defendant's allegedly tortious conduct from the less immediate downstream consequences of that injury.[7] Otherwise, "the commercial activity exception would in large part eviscerate the FSIA's provision of immunity for foreign states." *Id.*; *see United World Trade, Inc. v. Mangyshlakneft Oil Prod. Ass'n*, 33 F.3d 1232, 1238 (10th Cir. 1994) ("Congress did not intend to provide jurisdiction whenever the ripples caused by an overseas transaction manage eventually to reach the shores of the United States."). Here, by contrast, for Gliksberg and the Kibliskys (as well as for other United States investors who bought Subordinated Notes in reliance on SK Fund's misrepresentations), the

---

[7] Again, however, we note that this Court has left open the possibility that even "a foreign tort may have had sufficient contacts with the United States to establish the requisite 'direct effect' in this country." *Antares Aircraft*, 999 F.2d at 36.

31

financial loss suffered when their investments declined in value *was* their initial injury. In cases where the plaintiff's initial injury occurs in the United States— that is, where this country is the locus of the tort—there is no reason why that initial injury should not count as a direct effect merely because it happens to take the form of a financial loss.

Because United States investors in the Subordinated Notes were initially injured in this country (rather than abroad) by SK Fund's alleged tortious conduct, this case resembles products-liability cases against foreign states more than it does the cases cited by SK Fund involving foreign torts. In products-liability cases, courts have consistently held that the direct-effect clause is satisfied by allegations that a plaintiff was injured in the United States by a faulty product manufactured by the defendant abroad. *See Lyon v. Agusta S.P.A.*, 252 F.3d 1078, 1083 (9th Cir. 2001); *Aldy ex rel. Aldy v. Valmet Paper Mach.*, 74 F.3d 72, 75 (5th Cir. 1996); *Vermeulen v. Renault, U.S.A., Inc.*, 985 F.2d 1534, 1545 (11th Cir. 1993); *Rote v. Zel Custom Mfg., LLC*, No. 13-cv-1189, 2015 WL 570973, at *9 (S.D. Ohio Feb. 11, 2015); *see also* First Restatement § 377 note 1 ("[W]hen a person sustains bodily harm, the place of wrong is the place where the harmful force takes effect upon the body."). This persuasive authority lends additional support

to our conclusion that SK Fund's alleged misrepresentations caused a direct effect in the United States.

Finally, SK Fund argues that the relationship between its alleged misrepresentations and Plaintiffs' financial loss is too attenuated for that loss to qualify as a "direct effect." In particular, SK Fund argues that United States investors in the Subordinated Notes—including Gliksberg and the Kibliskys— could only have obtained the Information Memorandum containing SK Fund's alleged misrepresentations from "third-party intermediar[ies]" such as UBS, whose conduct in "forwarding the document to investors . . . was an intervening act between the commercial activity and any resulting effect in the United States."[8] Appellant's Br. at 35–36. This argument, too, is unavailing.

---

[8] SK Fund suggests that notwithstanding that the complaint alleges that it marketed the Subordinated Notes in the United States, Gliksberg and the Kibliskys were not intended recipients of the Information Memorandum, since they are neither non–U.S. persons nor QIBs and therefore presumably made their secondary-market purchases of Subordinated Notes in violation of those securities' transfer restrictions. SK Fund also claims that the district court was wrong to suggest that the Information Memorandum was freely available on the Internet, since the version of the relevant website that was live during the events at issue could be accessed only by those who certified that they were either non–U.S. persons or accredited investors or QIBs. These arguments are irrelevant to our jurisdictional analysis. As noted, whether an effect is foreseeable to the defendant has no bearing on whether it is "direct" for FSIA purposes, *see Weltover*, 504 U.S. at 618, and because "an objection to subject matter jurisdiction goes to the power of the court to hear and decide the case, . . . parties may not create *or destroy* jurisdiction by agreement or by consent." 5B Charles Alan Wright et al., *Federal*

33

The intervening actions of a third party may sometimes break the causal chain between a defendant's allegedly tortious actions and an effect felt in the United States—rendering the effect in this country not "direct"—where the defendant's actions affect the third party, who in turn takes some independent action that causes a further effect in the United States. *See Virtual Countries*, 300 F.3d at 237–38. In *Virtual Countries*, the Republic of South Africa issued a press release suggesting that it might contest an American company's ownership of a web domain name; the company claimed that this press release had a direct effect in the United States by discouraging third parties to do business with and invest in it. We held that this effect was not "direct" because it fell "at the end of a long chain of causation and [was] mediated by numerous actions by third parties":

> First, the Republic issued the press release. Then wire services and newspapers in South Africa and elsewhere obtained the release and wrote articles about it. Current or potential investors—perhaps in the United States, perhaps in other countries, and perhaps in both— and a potential strategic business partner in South Africa, allegedly then learned of the release's contents. Drawing on news reports, they then formed their own independent assessments of the Republic's intentions and the possible effect of those intentions on [the plaintiff company] and people who would do business with

*Practice & Procedure* § 1350 (3d ed.) (emphasis added); *cf. Mortimer Off Shore Servs., Ltd. v. Federal Republic of Germany*, 615 F.3d 97, 108 (2d Cir. 2010).

34

it. . . . Only then could investors and the prospective business partner have decided to give effect to their doubts as to the validity of the plaintiff's current registration of [the domain name] and their fears of reprisal by the Republic, by declining to invest in or do business with [the plaintiff company].

*Id.* at 237. Thus, the press release (after being communicated through press outlets) had its initial effect on third party investors and business partners, who had to take further action as a result of the press release in order for the American plaintiff to be affected at all.[9]

This case is different. Here, the third-party conduct cited by SK Fund— UBS's distribution of the Information Memorandum—was not in any sense undertaken in reliance on or as a result of SK Fund's alleged misrepresentations specifically. In other words, third-party intermediaries such as UBS would have distributed the Information Memorandum regardless of whether it contained misrepresentations about BTA Bank's financial situation, so that the conduct of such intermediaries cannot have been an *effect* of any such misrepresentations.

---

[9] Notably, the result in *Virtual Countries* is also consistent with an approach that focuses on the locus of the alleged tort. *See Antares Aircraft*, 999 F.2d at 36. Although the plaintiff in *Virtual Countries* did not allege that South Africa's press release was itself tortious, its argument was analogous to a claim for defamation. And "[w]here harm is done to the reputation of a person, the place of wrong is where the defamatory statement is communicated." First Restatement § 377 note 5; *cf. Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1185–86 (D.C. Cir. 2013) (finding no FSIA jurisdiction over claim for trade-dress infringement where allegedly infringing products were not "sold or advertised" in the United States).

Nor was it UBS's distribution of the Information Memorandum (as distinguished from the misrepresentations themselves) that ultimately caused Plaintiffs' injury. Unlike the press release in *Virtual Countries*, SK Fund's misrepresentations acted directly on those whom they allegedly affected, namely, the investors induced to purchase Subordinated Notes that were worth less than advertised.

Again, products-liability cases furnish a helpful analogy. Although a defective product may reach the plaintiff only through a long sequence of sales and shipments, that sequence does not attenuate the causal chain between the manufacturing defect and the plaintiff's injury because the sequence is in no way a function of the defect. *See, e.g.*, *Vermeulen*, 985 F.2d at 1545 ("[T]he injuries [plaintiff] suffered in an automobile accident on the roads of Georgia were the result of [defendant's] negligent design and manufacture of the LeCar passenger restraint system. We can hardly imagine a more immediate consequence of the defendant's activity."); *Lyon*, 252 F.3d at 1083–84 (finding FSIA jurisdiction while recognizing that "much time passed between the manufacture and the injury and that the [defective] aircraft even changed hands"). Likewise, the fact that a misrepresentation reaches an investor in an offering document distributed by a

third party does not attenuate the causal chain between the misrepresentation and the investor's loss.

Although it bears reiterating that an effect need not be foreseeable to be direct, *see Weltover*, 504 U.S. at 618, we do not intend to—indeed, we have no occasion to—foreclose entirely the possibility that an alleged misstatement by a foreign state may be so far removed from the American investor who eventually relies on it that FSIA jurisdiction will not lie. *See, e.g.*, *Filler v. Hanvit Bank*, 247 F. Supp. 2d 425, 429 (S.D.N.Y. 2003) (finding no FSIA jurisdiction over claims against Korean banks that made alleged misstatements about their finances in Korea, which were then incorporated into audit reports prepared by a Belgian company doing business with the banks, and which were later sent to and relied upon by the plaintiffs in investing in the Belgian company), *vacated on other grounds*, Nos. 01-cv-9510, 01-cv-8251, 2003 WL 21729978, at *1 (S.D.N.Y. July 25, 2003). Here, however, Plaintiffs allege, and SK Fund does not dispute, that BTA Bank and SK Fund marketed the Subordinated Notes "extensively in the United States, and directed that marketing to U.S. investors." J.A. 44. Gliksberg and the Kibliskys placed their orders with UBS, which was a Direct Participant in the 2010 Restructuring, and the parties to the 2010 Restructuring contemplated that

37

Direct Participants would be able to hold the newly issued securities "for the benefit of their customers," including accredited investors in the United States. J.A. 164, 485. Given that investors in securities offerings frequently make their purchases through underwriters who distribute offering documents on behalf of the issuer, adopting SK Fund's argument that UBS's actions broke the causal chain between SK Fund's misrepresentations and the losses suffered by United States investors could effectively result in near blanket immunity for foreign states against securities-fraud claims. We do not believe that such a result would be consistent with, much less required by, our FSIA precedents.

On the facts presented here, the relationship between SK Fund's alleged misrepresentations and the resulting financial loss suffered in this country by United States investors—including Gliksberg and the Kibliskys—is sufficiently direct to overcome FSIA immunity. We therefore affirm the district court's order denying SK Fund's motion to dismiss on FSIA grounds.

## II.

In the alternative, SK Fund argues that regardless of whether it has immunity from suit under the FSIA, the district court could not exercise personal jurisdiction over it consistent with due process. The parties dispute (1) whether

38

SK Fund, as a foreign corporation wholly owned by a foreign sovereign, may assert due process rights against the exercise of personal jurisdiction by American courts, and (2) if so, whether exercising jurisdiction over SK Fund in this case would violate those rights. We may exercise jurisdiction over this claim, if at all, under the discretionary doctrine of pendent appellate jurisdiction. For the following reasons, we decline to do so.

We have appellate jurisdiction over the issue of SK Fund's immunity under the FSIA pursuant to the collateral order doctrine. That doctrine permits interlocutory appeals from non-final orders involving "claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *Cohen v. Beneficial Life Ins. Corp.*, 337 U.S. 541, 546 (1949). Because sovereign immunity is conceptualized as immunity from suit, and not just immunity from liability, it is well-settled that the denial of a defendant's motion to dismiss on sovereign immunity grounds is an immediately appealable collateral order. *Rein v. Socialist People's Libyan Arab Jamahiriya*, 162 F.3d 748, 755–56 (2d Cir. 1998). By contrast, an order denying a motion to dismiss for lack of personal jurisdiction is *not* an

39

immediately appealable collateral order.[10]  *See id.* at 756.  So with respect to the constitutional questions raised by SK Fund regarding the district court's exercise of personal jurisdiction, we must have jurisdiction, if at all, under the doctrine of pendent appellate jurisdiction.  *See id.*

The doctrine of pendent appellate jurisdiction "allows us, '[w]here we have jurisdiction over an interlocutory appeal of one ruling,' to exercise jurisdiction over other, otherwise unappealable interlocutory decisions, where such rulings are 'inextricably intertwined' with the order over which we properly have appellate jurisdiction, or where review of such rulings is 'necessary to ensure meaningful review' of the appealable order."  *Myers v. Hertz Corp.*, 624 F.3d 537, 552 (2d Cir. 2010) (alteration in original) (quoting *Bolmer v. Oliveira*, 594 F.3d 134, 141 (2d Cir. 2010)); *see Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 51 (1995).  The Supreme Court has narrowly circumscribed the situations in which pendent appellate jurisdiction may appropriately be exercised in order to avoid "encourag[ing] parties to parlay *Cohen*-type collateral orders into multi-

---

[10] It is irrelevant that the district court denied SK Fund's motion to dismiss on personal jurisdiction grounds in the same "order" in which it rejected SK Fund's FSIA immunity arguments.  Although courts often phrase the question as whether a particular "order" is immediately appealable, our appellate jurisdiction under the collateral order doctrine is limited to the specific "issue" that is immediately appealable—here, FSIA immunity.  *Rein*, 162 F.3d at 756.

issue interlocutory appeal tickets," thereby undermining the general rule that an appeal may not be taken until a final judgment has been entered. *Swint*, 514 U.S. at 49-50. Moreover, "[w]e have indicated that the exercise of pendent appellate jurisdiction is discretionary, and that we will only exercise it in 'exceptional circumstances.'" *Myers*, 624 F.3d at 553 (citation omitted) (quoting *Jones v. Parmley*, 465 F.3d 46, 65 (2d Cir. 2006)).

Even assuming arguendo that, upon analysis, the question of SK Fund's immunity from suit under the FSIA would be so "inextricably intertwined" with its due process claim as to allow for pendent appellate jurisdiction, we choose not to reach SK Fund's due process argument. *See Myers*, 624 F.3d at 552. The key, antecedent question to SK Fund's constitutional claim—whether a foreign corporation wholly owned by a foreign sovereign is a "person" within the meaning of the Fifth Amendment Due Process Clause—is pending before another panel in *Corporacion Mexicana de Mantenimiento Integral v. Pemex-Exploracion y Produccion*, No. 13-4022-cv. This circumstance, far from the "exceptional" instance warranting pendent appellant jurisdiction, favors restraint. *Myers*, 624 F.3d at 553. Accordingly, we decline to exercise our

41

discretion to exercise pendent appellate jurisdiction over SK Fund's due process challenge.

**CONCLUSION**

We have considered SK Fund's remaining contentions and find them to be without merit.  For the foregoing reasons, we **AFFIRM** the portion of the district court's order holding that SK Fund is not immune from suit under the FSIA and **DISMISS** the portion of SK Fund's appeal challenging the district court's exercise of personal jurisdiction.