21-1085-cv
*Daou v. BLC Bank, S.A.L.*

# UNITED STATES COURT OF APPEALS
### FOR THE SECOND CIRCUIT

August Term, 2021

Argued: June 9, 2022     Decided: July 28, 2022

Docket No. 21-1085-cv

JOSEPH A. DAOU, KAREN DAOU,

*Plaintiffs-Appellants,*

— v. —

BLC BANK, S.A.L., CREDIT LIBANAIS, S.A.L., ALMAWARID BANK, S.A.L., BANQUE DU LIBAN,

*Defendants-Appellees.*

B e f o r e :

LYNCH, BIANCO, and NARDINI, *Circuit Judges.*

Plaintiffs-Appellants Joseph and Karen Daou (together, "the Daous") appeal the judgment of the United States District Court for the Southern District of New York (Cote, *J.*) dismissing their complaint against Defendants-Appellees

BLC Bank, S.A.L. ("BLC"), Credit Libanais, S.A.L. ("CL"), AlMawarid Bank, S.A.L. ("AM"), and Banque du Liban ("BDL") in this case involving the Daous' unsuccessful attempts to transfer U.S. dollars held in their Lebanese bank accounts to the United States. The Daous argue that the district court erred by holding that mandatory forum selection clauses in the Daous' agreements with BLC and AM required those claims to be litigated in Beirut, that it lacked personal jurisdiction over CL under New York's long-arm statute, and that BDL was entitled to sovereign immunity as an agency or instrumentality of the Lebanese state and that the commercial activity exception to the Foreign Sovereign Immunities Act did not apply.

We conclude that the district court was correct to dismiss the claims against BLC, CL, and AM because those claims did not arise from business transactions in New York, a requirement of the provision of the long-arm statute that the Daous invoke. The district court was also correct to dismiss the claims against BDL because BDL is entitled to sovereign immunity and the commercial activity exception does not apply, since any commercial activity on BDL's part did not have a direct effect in the United States.

Accordingly, we AFFIRM the judgment of the district court.

———————

CHRISTOPHER J. MAJOR, Meister Seelig & Fein LLP, New York, NY, *for Plaintiffs-Appellants.*

JEFFREY ROTENBERG, DLA Piper LLP, New York, NY (John O. Wray, *on the brief*), *for Defendants-Appellees BLC Bank, S.A.L. and Credit Libanais, S.A.L.*

MITCHELL R. BERGER, Squire Patton Boggs (US) LLP, Washington, DC (Gassan A. Baloul, Squire Patton Boggs (US) LLP, New York, NY, *on the brief*), *for Defendant-Appellee AlMawarid Bank, S.A.L.*

LINDA C. GOLDSTEIN, Dechert LLP, New York, NY (Ryan M. Moore, Dechert LLP, Philadelphia, PA, *on the brief*), *for Defendant-Appellee Banque du Liban.*

GERARD E. LYNCH, *Circuit Judge*:

Plaintiffs-Appellants Joseph and Karen Daou (together, "the Daous") appeal from a judgment of the United States District Court for the Southern District of New York (Denise L. Cote, *J.*) dismissing this action against Defendants-Appellees BLC Bank, S.A.L. ("BLC"), Credit Libanais, S.A.L. ("CL"), AlMawarid Bank, S.A.L. ("AM"), and Banque du Liban ("BDL") for want of subject-matter jurisdiction, for want of personal jurisdiction, and for *forum non conveniens* based on binding forum selection clauses in agreements the Daous entered into with AM and BLC. The Daous allege that Defendants-Appellees (together, "the Banks") engaged in a scheme to cheat them out of millions of U.S. dollars ("USD") by inducing them to deposit those dollars in Lebanese bank accounts with the promise that they would be able to withdraw that money in the United States, only to renege on that promise and keep the money trapped in Lebanon. The district court dismissed the claims against AM and BLC because the Daous' agreements with those banks included valid, enforceable forum selection clauses specifying Beirut as the proper forum; those against CL because it lacked personal jurisdiction over that bank; and those against BDL because that

3

bank is an agency or instrumentality of the Lebanese state and no exception applied under the Foreign Sovereign Immunities Act ("FSIA"), Pub. L. No. 94-583, 90 Stat. 2891 (1976), codified as amended at 28 U.S.C. §§ 1330, 1332, 1391(f), 1441(d), 1602-11. The Daous appeal each of those holdings.

We hold that the district court lacked personal jurisdiction over AM, BLC, and CL (together, "the Commercial Banks") under the relevant provision of New York's long-arm statute, N.Y. C.P.L.R. § 302(a)(1), because there was insufficient connection between the Daous' claims against the Commercial Banks and those banks' business transactions in New York. Having so held, we have no occasion to consider the enforceability of the forum selection clauses. We hold further that BDL, an agency or instrumentality of a foreign sovereign, is entitled to sovereign immunity. Contrary to the Daous' argument, the FSIA's commercial activity exception does not apply, because any commercial activity on BDL's part that forms part of the gravamen of the Daous' complaint did not have a direct effect in the United States.

We therefore AFFIRM the judgment of the district court.

## BACKGROUND

### I. Factual Background

Joseph and Karen Daou are dual citizens of the United States and Lebanon who reside in Florida. AM, BLC, and CL are commercial banks headquartered in and operating primarily in Lebanon, but all three maintain correspondent bank accounts in New York. "A correspondent bank account is a domestic bank account held by a foreign bank, similar to a personal checking account used for deposits, payments and transfer of funds. Correspondent accounts facilitate the flow of money worldwide, often for transactions that otherwise have no other connection to New York, or indeed the United States." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL* ("*Licci II*"), 732 F.3d 161, 165 n.3 (2d Cir. 2013) (quotation marks and citations omitted). AM, BLC, and CL use their correspondent bank accounts to facilitate the transfer of USD into and out of Lebanon. BDL is the central bank of Lebanon.

Joseph Daou opened USD-denominated accounts in Lebanon with CL on March 9, 2016 and with BLC on April 26, 2016. The agreements that he signed with both banks upon opening those accounts stipulated that Lebanese law would govern disputes regarding their relationship. The agreements with BLC

5

also included a mandatory forum selection clause, providing that "[t]he Beirut courts shall have exclusive jurisdiction to hear any dispute arising in connection with these General Conditions and/or relating to the relationship between the Bank and the Client," and that "[t]his exclusive jurisdiction is for the benefit of the Bank which shall be entitled to take action against the Client in any Lebanese or foreign court of its choice in order to defend its right." J. App'x at 375, 390. The agreements between Joseph Daou and CL did not include such a clause. According to the operative complaint, BLC and CL each routed four transactions with the Daous through New York correspondent accounts between 2016 and 2018.

In late 2019, Lebanon's financial sector began spiraling into crisis. Starting in the 1990s, the Lebanese pound ("LBP") had been pegged to the U.S. dollar, an arrangement that required a steady influx of USD into Lebanon to maintain. But in response to political unrest in 2019 that resulted in the prime minister's resignation, foreign investors began to pull out of the country, causing the influx of USD to dry up. The LBP began to plunge in value, and BDL and the Lebanese banking sector tried desperately to prevent a run on the banks, first by

6

temporarily closing the country's banks, and then by making it nearly impossible to remove large quantities of USD from the country.

By the end of 2019, the Daous had more than $18,500,000 on deposit in Lebanon, and like many other customers living outside Lebanon with large sums of USD in bank accounts in that country, they were concerned that their deposits would become essentially worthless overnight. Beginning in September 2019, Joseph Daou requested that BLC and CL execute millions of dollars in wire transfers from the Daous' accounts with those banks to accounts in the United States, a request that both banks denied. He then traveled to Lebanon in December 2019 and opened an account with a third bank – AM – which he hoped could help him repatriate his family's USD. The agreement that Joseph Daou signed upon opening the AM account included a forum selection clause providing that "[t]he Beirut courts shall have the exclusive jurisdiction to hear any case or dispute brought up by the Second Party against the Bank," but that "the Bank may choose to prosecute the Second Party and/or its guarantors either in the Beirut courts and its enforcement departments and/or the courts of the Second Party's residence and/or its sponsors and/or the location of the real estate or the commercial establishment that is the subject of the execution, and the

7

Second Party refrains from raising any plea related to the invalidity, indicating that its place of residence or residence differs from its elected domicile." J. App'x at 170. Joseph Daou deposited $5,735,928.67 (already present in Lebanon) in the AM account, allegedly on the understanding that he would eventually be able to wire it to United States.[1] He requested in December 2019 and January 2020 that AM wire-transfer the balance of the Daous' accounts to the United States, but AM, like the other Commercial Banks before it, refused to transfer the funds.

After repeated, failed attempts to move their USD to the United States via wire transfer, the Daous agreed to accept USD-denominated checks from BLC, CL, and AM, drawn against BDL, with whom all three Commercial Banks had accounts.[2] The Daous allege that all three Commercial Banks represented that they would be able to deposit those checks in the United States. Each of the checks stated on its face, however, that it was "payable [at] Beirut." J. App'x at

---

[1] Although the operative complaint alleges broadly that, "[f]or USD transactions, AM Bank uses its correspondent bank account at Bank of New York Mellon, N.A. in New York," J. App'x at 277, it does not allege any specific transaction involving the Daous' AM accounts and AM's New York correspondent accounts.

[2] While the Daous have variously referred to the checks as "bankers checks," Appellants' Br. at 14, and "cashier's checks," J. App'x at 238, there is no allegation in the operative complaint that any BDL representative was personally involved in issuing the checks that the Commercial Banks made out to the Daous.

657, 752, 862. The Daous deposited their checks at banks in the United States, but BDL refused to transfer the money, stating that it was not accepting checks for collection abroad and that the checks would have to be presented to a local bank in Lebanon. The Daous allege that their inability to get their money out of Lebanon caused them to lose real estate deals in the United States, resulting in damages in excess of $60 million.

## II.    Procedural History

The Daous filed this action in the district court on June 10, 2020, asserting common-law claims for civil conspiracy, fraud, issuance of dishonored checks, conversion, breach of contract, promissory estoppel, and unjust enrichment, as well as statutory claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c), and Fla. Stat. §§ 68.065 and 673.4121, which authorize a cause of action to collect on worthless payment instruments. They filed their first amended complaint ("FAC") four months later. In November and December 2020, all four defendants moved to dismiss the FAC, both on jurisdictional and *forum non conveniens* grounds and for failure to state a claim. The Daous opposed the motions to dismiss and, in the alternative, requested jurisdictional discovery.

9

The district court granted all four defendants' motions to dismiss in an April 9, 2021 order, in each instance ruling only on threshold matters of jurisdiction or *forum non conveniens* without reaching the merits. *Daou v. BLC Bank, S.A.L.*, No. 20-cv-4438, 2021 WL 1338772, at *9 (S.D.N.Y. Apr. 9, 2021). The district court dismissed the claims against BLC and AM for *forum non conveniens* on the ground that those claims were subject to valid and enforceable forum selection clauses pointing to Beirut,[3] rejecting the Daous' arguments that it would be unsafe for them to litigate in Lebanon and that they would not be able to win a lawsuit or enforce a judgment against the Banks in that country. *Id.* at *3-5. The district court dismissed the claims against BDL for want of subject-matter jurisdiction, holding that BDL was entitled to sovereign immunity as the agency or instrumentality of a foreign state and that the FSIA's commercial activity exception – the only exception to that statute's grant of sovereign immunity that the Daous asserted – did not apply, because any commercial activity on BDL's part was not the gravamen of the complaint, and because such activity did not have a direct effect in the United States. *Id.* at *5-7. Finally, the district court

_____

[3] "[T]he appropriate way to enforce a forum-selection clause pointing to a state or foreign forum is through the doctrine of *forum non conveniens*." *Atl. Marine Constr. Co. v. U.S. Dist. Ct. for the W. Dist. of Tex.*, 571 U.S. 49, 60 (2013).

10

dismissed the claims against CL for want of personal jurisdiction, concluding that the section of New York's long-arm statute on which the Daous relied, N.Y. C.P.L.R. § 302(a)(1), which confers jurisdiction over persons transacting business in New York, did not confer personal jurisdiction over CL in this case because CL's transactions with the Daous through New York correspondent accounts – its only alleged conduct within the state – were both too few in number and insubstantially connected to the Daous' claims against CL. *Id.* at *7-8. The district court did not rule on the Daous' alternative request for jurisdictional discovery. This appeal followed.

## DISCUSSION

On appeal, the Daous argue that the district court erred by dismissing the claims against AM and BLC for *forum non conveniens* based on the forum selection clauses, by holding that BDL was entitled to sovereign immunity, and by concluding that it lacked personal jurisdiction over CL in this case under N.Y. C.P.L.R. § 302(a)(1). Not only do the Banks contest those arguments, but AM and BLC argue that the district court lacked personal jurisdiction over them as well. We conclude that the district court lacked personal jurisdiction under § 302(a)(1) over all three Commercial Banks, and thus we have no occasion to consider

11

whether it erred by enforcing the forum selection clauses. *See Headley v. Tilghman*, 53 F.3d 472, 476 (2d Cir. 1995) ("We are free to affirm on any ground that finds support in the record, even if it was not the ground upon which the trial court relied."). We conclude further that the district court correctly held that BDL is entitled to sovereign immunity and that the FSIA's commercial activity exception does not apply.

I.      **Personal Jurisdiction Over the Commercial Banks**

The Daous argue that the district court erred by holding that it lacked personal jurisdiction over CL under New York's long-arm statute, or in the alternative, that it erred at least by denying them jurisdictional discovery. We disagree, and we hold further that the district court lacked long-arm jurisdiction over AM and BLC for identical reasons.

"We review a district court's dismissal of an action for want of personal jurisdiction de novo, construing all pleadings and affidavits in the light most favorable to the plaintiff . . . . [T]o survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists." *Chufen Chen v. Dunkin' Brands, Inc.*, 954 F.3d 492, 497 (2d Cir. 2020) (internal quotation marks and citations omitted; alteration in original), quoting *SPV Osus*

12

*Ltd. v. UBS AG*, 882 F.3d 333, 342 (2d Cir. 2018). "We review a district court's denial of jurisdictional discovery for abuse of discretion." *Arch Trading Corp. v. Republic of Ecuador*, 839 F.3d 193, 206 (2d Cir. 2016).

"In the absence of a federal statute specifically directing otherwise, and subject to limitations imposed by the United States Constitution, we look to the law of the forum state to determine whether a federal district court has personal jurisdiction over a foreign corporation." *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 624 (2d Cir. 2016). Because "[t]he reach of New York's long-arm statute . . . does not coincide with the limits of the Due Process Clause," *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 244 (2d Cir. 2007), when the forum is in New York, we must look to that statute's specific provisions to determine whether personal jurisdiction exists as a matter of state law. In this case, the Daous assert that the district court had personal jurisdiction over the Commercial Banks under N.Y. C.P.L.R. § 302(a)(1), which confers on courts personal jurisdiction over a defendant who "transacts any business within the state or contracts anywhere to supply goods or services in the state," "[a]s to a cause of action arising from" such a transaction. "To establish personal jurisdiction under section 302(a)(1), two requirements must be met: (1) The defendant must have transacted business

within the state; and (2) the claim asserted must arise from that business activity." *Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 103 (2d Cir. 2006), citing *McGowan v. Smith*, 52 N.Y.2d 268, 273 (1981). The district court concluded that the Daous failed to satisfy either requirement.

We agree with the Daous that, contrary to the district court's holding with respect to CL, all three Commercial Banks "transact[ed] business" in New York despite the relatively small number of specific correspondent transactions alleged. Section 302(a)(1) is a "single act statute," and "proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted." *Deutsche Bank Sec., Inc. v. Montana Bd. of Invs.*, 7 N.Y.3d 65, 71 (2006), quoting *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467 (1988). To be sure, determining whether a defendant transacted business in the state "necessarily requires examination of the particular facts in each case," *Licci v. Lebanese Canadian Bank, SAL* ("*Licci I*"), 20 N.Y.3d 327, 338 (2012), and where the putative transaction is use of a correspondent bank account, "the frequency and deliberate nature of [the defendant's] use of its correspondent account[s] [may] be

14

determinative" of whether that use was intentional, *Licci II*, 732 F.3d at 168; *see also Amigo Foods Corp. v. Marine Midland Bank-N.Y.*, 39 N.Y.2d 391, 396 (1976) ("[S]tanding by itself, a correspondent bank relationship, without any other indicia or evidence to explain its essence, may not form the basis for long-arm jurisdiction under [§ 302(a)(1)]."). But the present case is not one in which the defendant may have used its correspondent accounts only adventitiously, "once or twice *by mistake*." *Licci I*, 20 N.Y.3d at 340 (emphasis added). The Daous have alleged, and the Commercial Banks do not dispute, that each of the Commercial Banks purposefully use New York correspondent accounts on a regular basis to move USD deposits in and out of Lebanon. Moreover, the FAC identifies at least four occasions on which BLC and CL each used New York correspondent accounts to execute transactions on behalf of the Daous in particular.[4] The Daous therefore have adequately alleged one or more transactions of business in New York on the part of each Commercial Bank for purposes of § 302(a)(1).

Nevertheless, we agree with the district court that the Daous' claims

---

[4] To the extent that the FAC does not allege a specific transaction involving the Daous' AM accounts and AM's New York correspondent accounts, that goes to the nexus between the Daous' claims and AM's transactions of business in New York, to which we turn next.

15

against CL did not *arise from* that bank's transactions of business in New York for purposes of § 302(a)(1), and the same is true with respect to AM and BLC. This "second prong of the jurisdictional inquiry" under § 302(a)(1) "require[s] that, in light of all the circumstances, there must be an 'articulable nexus' or 'substantial relationship' between the business transaction and the claim asserted." *Licci I*, 20 N.Y.3d at 339, quoting *McGowan*, 52 N.Y.2d at 272, and *Kreutter*, 71 N.Y.2d at 467. Although "the inquiry under the statute is relatively permissive," and "causation is not required," *id.*, not every conceivable connection to a New York transaction is substantial enough to confer jurisdiction. "In effect, the 'arise-from' prong limits the broader 'transaction-of-business' prong to confer jurisdiction only over those claims in some way arguably connected to the transaction. Where this necessary relatedness is lacking, [the New York Court of Appeals has] characterized the claim as 'too attenuated' from the transaction, or 'merely coincidental' with it." *Id.* at 339-40 (citation omitted). For example, in *Johnson v. Ward*, 4 N.Y.3d 516 (2005), the New York Court of Appeals held that, even assuming that the defendant negligent driver "transacted business" in New York by obtaining his license and registration there, that transaction did not confer on the New York courts personal jurisdiction over him in a personal injury suit,

16

because it was his negligent driving in New Jersey, not his obtaining the license and registration, that was the subject of the claims against him. *Id.* at 519-20.

A claim may arise from the use of a correspondent bank account for purposes of § 302(a)(1) where an alleged actual transaction made through such an account formed part of the alleged unlawful course of conduct underlying the cause of action set out in the complaint. In *Licci*, for example, the plaintiffs brought aiding-and-abetting claims under the federal Anti-Terrorism Act and Alien Tort Statute, as well as common-law negligence claims and claims for breach of statutory duty under Israeli law, against the defendant Lebanese bank for facilitating international transactions with Hizballah, a Lebanese militant group classified by the State Department as a terrorist organization. *Licci I*, 20 N.Y.3d at 330-31. The New York Court of Appeals held in response to a question certified by this Court that the plaintiffs' claims arose from the defendant's use of a New York correspondent account because, "[a]ccepting the complaint's allegations as true, [the defendant's] use of its AmEx correspondent account to transfer money . . . provided money for Hizballah to carry out terrorist violence." *Id.* at 340; *see also Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, 329-30 (2016) (holding that claims for aiding and abetting breach of fiduciary duty and civil conspiracy

17

involving international money-laundering scheme arose from use of New York correspondent accounts for purposes of § 302(a)(1) because "[t]hese claims depend on the assertions that defendants established the banking structure in New York and Geneva through which they orchestrated the money laundering . . . scheme" and "effected the transfers of money to the New York correspondent bank as part of" that scheme).

Here, however, the alleged unlawful conduct underlying the Daous' claims does not involve a specific transaction through New York correspondent accounts – rather, the Daous allege that the Commercial Banks have used their New York correspondent accounts to handle the Daous' and other investors' money *in the past* and likely would have done so if, counterfactually, they had transferred the Daous' money to the United States as promised.

New York's appellate courts have not considered whether past or potential future use of correspondent accounts alone may satisfy § 302(a)(1)'s arise-from requirement, but the state trial courts to have considered that question have answered it in the negative. In *Malaeb v. Bankmed S.A.L.*, No. 157804/2020, 2021 WL 1925638 (N.Y. Sup. Ct. May 13, 2021), the court rejected an argument nearly identical to that of the Daous here, made by a depositor plaintiff who wished to

move his money out of Lebanese banks that also maintained New York correspondent accounts. As the court explained:

> Plaintiff alleges that defendants heavily promoted their New York correspondent banking relationships to cloak themselves in the legitimacy and strength of massive New York banks, as well as to promote defendants' ability to readily effect international transfers of USD. To date, defendants have closed off plaintiff's access to their New York correspondent accounts, and refused to allow plaintiff to withdraw or transfer his USD outside Lebanon . . . . [N]one of plaintiff's three causes of action [for fraud, conversion, and unjust enrichment] against each bank defendant rely upon transfers of funds through New York correspondent accounts . . . . Not a single element of any of these claims is tethered to defendants' New York correspondent accounts, and removing the correspondent accounts from the equation has no impact on plaintiff's claims.

*Id.* at *3, *7 (citations omitted). On similar facts, the court in *Trans Atl. Imaging, S.A.L. v. Banque MISR Liban S.A.L.*, No. 654432/2020, 2021 WL 2435887 (N.Y. Sup. Ct. June 15, 2021), rejected essentially the same argument that the Daous make, reasoning that

> plaintiffs' multiple wire transfers of United States dollars for deposit in their account in defendant bank, each executed through defendant's Bank of New York Mellon correspondent account, bore no relationship to defendant's alleged breach of the Agreement. In other words, there is no articulable nexus between such

19

> deposits made through defendant bank's correspondent
> account and either defendant bank's refusal to honor
> plaintiffs' request to withdraw such funds on deposit by
> wire transferring the United State[s] dollars to plaintiffs'
> account(s) in the United States, or its offer to grant
> plaintiffs' withdrawal request through the issuance of
> cashier's check(s) negotiable inside Lebanon only.

*Id.* at *2 (footnote omitted), citing *Khalife v. Audi Saradar Private Bank SAL*, 129

A.D.3d 468, 573-74 (1st Dep't 2015). The Daous do not cite a single case in which

a New York court found a sufficient nexus to confer personal jurisdiction under

§ 302(a)(1) where the alleged use of a New York correspondent account was not

part of a specific transaction underlying a claim, nor do they give us any reason

to believe that the trial courts' reasoning in *Malaeb* and *Trans Atlantic Imaging* was

or is out of step with state appellate authority.

We hold that there is no substantial connection between the Commercial

Banks' use of their correspondent accounts and the Daous' claims. The FAC

asserts claims of civil conspiracy, fraud, issuance of dishonored checks, violations

of Florida statutes on collection instruments, breach of contract, conversion,

unjust enrichment, promissory estoppel, and civil RICO violations, all of which

turn on alleged measures taken by Lebanese banks in Lebanon to ensure that

USD deposits remained in that country. The FAC, unlike the complaints in *Licci*

20

and *Rushaid*, does not include a single allegation that any defendant used an actual, specific transaction through a New York correspondent account in the course of bringing about the injuries on which the claims are predicated – namely, that the Daous' USD remained in Lebanon.

To the extent that the Daous allege that the Commercial Banks advertised the availability of their New York correspondent accounts to potential customers and used those accounts to transfer some of the millions of dollars in the Daous' accounts into Lebanon in the first instance, the connection between those past transactions and the claims in the FAC is "merely coincidental." *Johnson*, 4 N.Y.3d at 520. Just as the defendant driver in *Johnson* "could have had a license from any state, or no license," *id.*, the Commercial Banks could have routed the Daous' USD deposits through correspondent accounts in Florida, London, or Switzerland, or through no correspondent account at all – indeed, the FAC itself alleges that Joseph Daou deposited much of the money in person in Lebanon. Moreover, the Daous' reliance on past transactions is especially problematic for personal jurisdiction over AM, because there is no allegation in the FAC that AM used its New York correspondent accounts in connection with the Daous on any specific occasion.

21

To the extent that the Daous allege that the requested wire transfers likely would have been routed through the New York correspondent accounts if the Commercial Banks had not refused those requests, that allegation is not only highly speculative, but supplies no connection whatsoever, much less a substantial one, between the claims and any actual transaction that occurred in New York. Even accepting as true that the Commercial Banks expressly "represented in late 2019 that they would wire the Daous their USD through the [] New York correspondent bank accounts," Appellants' Reply Br. at 7, that is conduct that occurred in Lebanon, in connection with, at most, fictitious future transactions of business in New York that the Commercial Banks did not actually make or, per the allegations in the FAC, intend to make. The Daous cite no authority for the proposition that a hypothetical future transaction that never actually occurred can form the basis for personal jurisdiction under § 302(a)(1).[5]

For these reasons, we conclude that the district court was correct to dismiss

---

[5] The Daous also argue in their reply brief that the district court could exercise personal jurisdiction over the Commercial Banks consistent with the principles of conspiracy jurisdiction. "We need not address this argument because it was raised on appeal for the first time in [the Daous'] reply brief and is therefore wa[i]ved." *Pettaway v. Nat'l Recovery Sols., LLC*, 955 F.3d 299, 305 n.2 (2d Cir. 2020).

the Daous' claims against CL for want of personal jurisdiction under N.Y.

C.P.L.R. § 302(a)(1), and that, for the same reasons the district court lacked

personal jurisdiction over CL, it also lacked such jurisdiction over AM and BLC.[6]

## II.     BDL's Sovereign Immunity

The Daous also argue that the district court erred by dismissing their

claims against BDL for want of subject-matter jurisdiction. We disagree. The

district court correctly held that BDL, as an agency or instrumentality of the

Lebanese state, was entitled to sovereign immunity, and that the FSIA's

commercial activity exception did not apply to abrogate that immunity.

"On appeal of a dismissal for lack of subject matter jurisdiction under the

---

[6] The Daous argue in the alternative that, at a minimum, the district court abused its discretion by denying their request for jurisdictional discovery, but that argument is likewise unconvincing. "A district court has wide latitude to determine the scope of discovery, . . . and is typically within its discretion to deny jurisdictional discovery when the plaintiff [has] not made out a prima facie case for jurisdiction." *Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*, 582 F.3d 393, 401 (2d Cir. 2009) (internal quotation marks and citations omitted; alteration in original). Here, no factual dispute needs to be resolved in order to determine whether the district court had personal jurisdiction over any of the Commercial Banks. Rather, as just explained, even accepting all of the Daous' allegations as true, as a matter of law, they have not made a *prima facie* showing that the district court could properly exercise jurisdiction over the Commercial Banks. The district court therefore did not abuse its discretion by denying the Daous' request for jurisdictional discovery.

23

FSIA, '[w]e review the district court's legal conclusions concerning sovereign immunity *de novo* and its factual findings for clear error.'" *Arch Trading*, 839 F.3d at 199 (alteration in original), quoting *Kensington Int'l Ltd. v. Itoua*, 505 F.3d 147, 153 (2d Cir. 2007)). The FSIA "provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country." *Argentine Republic v. Amerada Hess Shipping Co.*, 488 U.S. 428, 443 (1989). The same is true of the agency or instrumentality of a foreign state, which is treated as a foreign sovereign for purposes of the FSIA. 28 U.S.C. § 1603(a). Under that statute, "a foreign state is presumptively immune from the jurisdiction of United States courts; unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state." *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993); *see* 28 U.S.C. § 1604.

The Daous concede that BDL, as the central bank of Lebanon, is an agency or instrumentality of the Lebanese state, and thus it is entitled to sovereign immunity unless one of the FSIA's statutory exceptions applies. The Daous invoke one such exception: the "commercial activity" exception, which provides that a foreign state is not immune in any case "in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon

an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." *Id.* § 1605(a)(2). Specifically, they argue that BDL committed "an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that[] cause[d] a direct effect in the United States." *Id.* To invoke that part of the commercial activity exception, the Daous must establish that (1) BDL engaged in "a commercial activity," (2) "the action is based upon" that activity, and (3) that activity "cause[d] a direct effect in the United States." *Id.* We conclude that the commercial activity exception does not apply, because to the extent that the Daous' action is based upon a commercial activity, such activity did not have a direct effect in the United States.

The FSIA defines "commercial activity" as "either a regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. § 1603(d). The statute also provides that "[t]he commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." *Id.* The

25

Supreme Court has held "that a state engages in commercial activity . . . where it exercises 'only those powers that can also be exercised by private citizens,' as distinct from those 'powers peculiar to sovereigns.'" *Nelson*, 507 U.S. at 360, quoting *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992). As this Court has recognized, however, that "is a standard more easily stated than applied, . . . and its application may sometimes depend on the level of generality at which the conduct is viewed." *Pablo Star Ltd. v. Welsh Gov't*, 961 F.3d 555, 561 (2d Cir. 2020). In *Pablo Star*, for example, we held that the Welsh Government engaged in commercial activity when it used photographs in printed and electronic materials promoting tourism in Wales. *Id.* at 560-65. While we acknowledged that one might reasonably conceptualize the Welsh Government's activity as "promot[ing] Welsh culture and tourism pursuant to its statutory mandate under the Government of Wales Act 2006," we explained that "the goal of enhancing the image of the country and the prosperity of its citizens . . . are the purposes or reasons for the Welsh Government's actions, and not what it did to accomplish its goals." *Id.* at 562 (emphasis omitted).

Here, as the district court implicitly acknowledged, BDL engaged in at least one course of commercial activity: allowing the Commercial Banks to open

checking accounts, which the Commercial Banks then used to write checks to the Daous, and then denying requests by banks in the United States to transfer the funds upon deposit of those checks. That is the sort of activity in which any commercial bank could engage.

However, the commercial activity exception applies only where the action is "based upon" the commercial activity in question. 28 U.S.C. § 1605(a)(2). "[A]n action is 'based upon' the 'particular conduct' that constitutes the 'gravamen' of the suit." *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 35 (2015), quoting *Nelson*, 507 U.S. at 356-58. Thus, in *Nelson*, a case involving personal injury claims against the Saudi government by an American doctor who was employed through a third-party contractor in a Saudi government-owned hospital and detained and tortured for reporting safety hazards in that hospital, the Supreme Court held that the action was not "based upon" the commercial activity of recruiting and hiring the doctor, because the "gravamen" of his suit was the detention and torture, not the recruitment and hiring. 507 U.S. at 356-63. And in *Sachs*, the Court held that a personal injury suit against an Austrian government-owned railroad company was not "based upon" the commercial activity of selling a railroad pass to the plaintiff in the United States, even though that sale was relevant to one of

27

the elements of one of the plaintiff's common-law tort claims. 577 U.S. at 32-36. In so holding, the Court disclaimed an "exhaustive claim-by-claim, element-by-element analysis of [all] causes of action," emphasizing that courts must "zero[] in on the core of [the] suit," and if that core is "sovereign acts," then the commercial activity exception does not apply. *Id.* at 34-35.

Here, the district court concluded that even if BDL engaged in commercial activity in connection with the checks, the suit is not "based upon" that activity, because "[t]he gravamen of plaintiffs' complaint . . . involves the conduct of the Commercial Bank Defendants in accepting the plaintiffs' deposits, refusing to authorize wire transfers, and issuing the checks." *Daou*, 2021 WL 1338772, at *7. The Daous contend instead – for the first time in their reply brief – that "[i]n reality, BDL played a central role in blocking [them] from receiving their USD," because "[a]ll of the [Commercial] Banks issued banker's checks drawn against BDL to the Daous with the express acknowledgement [*sic*] that the Daous could and would deposit the checks in the U.S.," and after the Daous' banks in the United States accepted those checks for deposit, "BDL refused collection." Appellants' Reply Br. at 27. We need not decide whether such activity forms the "gravamen" of the complaint, because even assuming *arguendo* that it does,

28

BDL's activity did not have a "direct effect in the United States" within the meaning of the FSIA.

"[A]n effect is direct" for purposes of the commercial activity exception "if it follows as an immediate consequence of the defendant's activity." *Weltover*, 504 U.S. at 618 (internal quotation marks, ellipsis, and citation omitted). Three principles qualifying that requisite immediacy convince us that in the present case, BDL's activity did not have a direct effect in the United States for purposes of the commercial activity exception.

First, "the mere fact that a foreign state's commercial activity outside of the United States caused physical or financial injury to a United States citizen is not itself sufficient to constitute a direct effect in the United States." *Guirlando v. T.C. Ziraat Bankasi A.S.*, 602 F.3d 69, 78 (2d Cir. 2010). In *Guirlando*, for example, we held that a Turkish government-owned bank's decision to allow the plaintiff's husband to withdraw funds from a joint bank account in Turkey did not have a direct effect in the United States simply because the plaintiff was a United States citizen and was "impoverish[ed]" in this country as a result. *Id.* at 79. The same is true in the present case: The fact that the Daous, who felt the financial impact of BDL's actions, are United States citizens is not enough on its own to trigger the

29

commercial activity exception. Rather, we must look to the putatively unlawful conduct on BDL's part as alleged in the complaint.

Second, the place where a direct effect is felt is generally either a contract's designated place of performance (if any) or the locus of a tort, depending on the particular sort of alleged unlawful conduct that forms the gravamen of the complaint. And regardless of how one conceives of the gravamen of the Daous' complaint as it relates to BDL,[7] there is no such direct effect in the United States.

"[I]n contract cases, a breach of a contractual duty causes a direct effect in the United States sufficient to confer FSIA jurisdiction so long as the United States is the place of performance for the breached duty." *Atlantica Holdings v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 813 F.3d 98, 108-09 (2d Cir. 2016). For example, in *Weltover*, the Supreme Court held that Argentina's rescheduling of maturity dates on bonds had a "direct effect" in the United States because New York was expressly designated as a place of payment for those bonds. 504 U.S. at 618-19; *see also Com. Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 240-41 (2d Cir.

---

[7] This case is not simply either a "contract case" or a "tort case," because the Daous bring both tort and contract claims against BDL. And again, we only assume *arguendo* that *any* of BDL's commercial activity forms a part of the gravamen of the FAC.

1994) (holding that Iraqi banks' failure to remit funds in New York had a direct effect in the United States because contract that they allegedly breached required them "to make payments in U.S. dollars into accounts in New York City").

The same is true where a contractual provision allows the foreign sovereign's creditor to choose the place of payment. For example, in *Hanil Bank v. PT. Bank Negara Indonesia (Persero)*, 148 F.3d 127 (2d Cir. 1998), we held that the defendant's alleged refusal to pay on a letter of credit had a direct effect in the United States because that letter "authorized the [plaintiff] to designate the place of payment," and thus when the plaintiff selected New York, the defendant "had already impliedly agreed to New York as the place of payment." *Id.* at 132. We have left open the possibility that these principles may apply by analogy in cases that are not formally brought in contract but that turn on failure to meet a financial obligation, but we have maintained that where such obligation does not come with any required place of performance, the fact that the plaintiff *happens* to seek payment in the United States does not automatically render the effect in this country sufficiently direct for FSIA purposes. For example, we held in *Kensington International* that interference abroad with a judgment obtained in New York had no "direct effect" in the United States because a "judgment does not have a 'place

of performance'" and "[t]here is no requirement that repayment of this debt be made in New York." 505 F.3d at 159.

To the extent the claims against BDL sound in contract, the Daous' direct-effect argument fails because the checks do not designate the United States as a place of payment. The Daous attempt to liken the present case to *Weltover* by arguing that they "were [contractually] entitled to and did deposit the checks drawn on the BDL in the U.S.," Appellants' Br. at 56, but they had no relationship with BDL, and at any rate, nothing on the face of the checks as printed by BDL indicated that the checks could be deposited in the United States. BDL simply issued blank checks listing Beirut, if anywhere, as the proper place of payment. Thus, as in *Kensington* and unlike in *Weltover*, there was no special obligation to pay on those checks in the United States as opposed to anywhere else. Nor did the checks as BDL issued them allow either the Commercial Banks or the Daous to specify a place of payment, as in *Hanil Bank*. Put another way, once BDL provided the Commercial Banks with checking accounts, and even after the Commercial Banks used those accounts to write checks payable to the Daous, BDL had no more of an obligation to pay the Daous in the United States than it had to pay them in Lebanon, Mongolia, Djibouti, or any other country where

32

they might happen to deposit the checks.

In tort cases, we have generally considered the place where a direct effect is felt to be the "tort's locus," which is usually "the place where [the] damage was sustained." *Atlantica Holdings*, 813 F.3d at 109 (internal quotation marks and citation omitted). In *Atlantica Holdings*, for example, we held that the defendant's alleged misrepresentations abroad caused a direct effect in the United States because the plaintiffs, American investors acting from the United States, purchased securities in reliance on those misrepresentations and suffered a financial loss in this country as a result. *Id.* at 109-11.

To the extent the Daous' claims against BDL sound in tort, the locus of that tort is in Lebanon. In arguing that the United States is the locus of the tort, the Daous cite a passage from *Atlantica Holdings* stating that a claim "arises where its economic impact is felt, normally the plaintiffs' residence." 813 F.3d at 110 (internal quotation marks and citation omitted). But the Daous take that passage out of context – it specifically concerns "the locus of a Section 10(b) claim" under the Securities and Exchange Act, which is analogous for location purposes to an ordinary common-law fraud claim. *Id.* The Daous' claims against BDL are of a different character. The FAC includes several different tort claims, but whether

one conceives of this on balance as a conversion case or a dishonored-check case, the injury that the Daous allege BDL caused is that a specific cache of millions of USD already present in Lebanon remained in that country. For purposes of locating a tort in which "harm is caused to . . . chattels, the place of wrong is the place where the force takes effect on the thing." Restatement (First), Conflict of Laws, § 377, cmt. a, note 3 (1937); *see Atlantica Holdings*, 813 F.3d at 109 n.5 (endorsing use of the First Restatement's *lex loci delicti* approach in the FSIA context despite intervening changes in many states' choice-of-laws rules).[8] Insofar as BDL's actions exerted any force on the Daous' money, they did so in Lebanon, where that money was located prior to BDL's involvement in the events of this case and where it remained as an alleged result.

Third, "[w]e have held that 'the requisite immediacy' is lacking where the alleged effect 'depend[s] crucially on variables independent of' the conduct of the foreign state," including intervening actors. *Guirlando*, 602 F.3d at 75 (first

---

[8] To be sure, in *Atlantica Holdings*, we described the locus of the tort as a place where, *at minimum*, a direct effect occurs. *See* 813 F.3d at 109 n.5 (emphasis added), quoting *Antares Aircraft, L.P. v. Fed. Republic of Nigeria*, 999 F.2d 33, 36 (2d Cir. 1993) ("[F]or FSIA purposes, we have found a direct effect (*at least*) at 'the locus of the tort.'"). But the Daous do not argue for a more expansive conception of direct effects, instead arguing that the United States is the locus of the tort because they suffered an economic loss here.

alteration added; second alteration in original), quoting *Virtual Countries, Inc. v. Republic of South Africa*, 300 F.3d 230, 238 (2d Cir. 2002). In *Guirlando*, for example, we rejected the plaintiff's direct-effect argument for the additional reason that her "financial loss was not a direct result of the Bank's denying her the right to open an individual account, for between that conduct and her impoverishment there was an intervening element, to wit, [her husband's] larcenous withdrawals." *Id.* at 79-80. In contrast, the involvement of intervening actors does not preclude a direct effect in the United States if an otherwise immediate effect in this country would have occurred even without their involvement. Thus, in *Atlantica Holdings*, we rejected the defendant's argument that dissemination by third parties of a memorandum containing the defendant's alleged misrepresentations attenuated the chain of causation between those misrepresentations and the harm that the plaintiffs suffered. 813 F.3d at 115-16.

Here, even if the United States were a place of performance or the locus of a tort that is part of the gravamen of the Daous' complaint, that location would "depend[] crucially on variables independent of [BDL's] conduct." *Guirlando*, 602 F.3d at 75 (internal quotation marks and citation omitted). As the district court recognized, "[a]ny effect felt in the United States was contingent on, *inter alia*, the

35

Commercial Bank Defendants' decisions to address their disputes with the plaintiffs by issuing the checks and the plaintiffs' decision to attempt to deposit those checks in the United States." *Daou*, 2021 WL 1338772, at *7. BDL, as noted above, has no relationship with the Daous, and its conduct would not have had any effect in the United States, as opposed to any other country, had the Commercial Banks not made the independent decision to write the Daous checks drawn against BDL. Thus, here, as in *Guirlando*, the immediacy of the putative commercial activity's effect in the United States is fatally undermined by dependence on the conduct of intervening actors.[9]

Because BDL had no special obligation to pay on the checks in the United States, because the locus of any tort is in Lebanon, and because any effect in the United States depended crucially on the conduct of intervening actors, we hold

---

[9] The Daous further argue that "participation in a conspiracy can be a separate basis for finding a direct effect in the U.S.," Appellants' Br. at 56, but the sole case that they cite for that proposition, in addition to being out-of-Circuit and thus not binding on this Court, concerned actions taken by the foreign sovereign's agency or instrumentality *itself*, not its alleged co-conspirators. *See EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro, S.A.*, 894 F.3d 339, 345-49 (D.C. Cir. 2018) (holding that state-owned petroleum company's alleged fraud caused a direct effect in the United States because that company allegedly "specifically targeted U.S. investors"). Here, as discussed above, neither BDL nor the Commercial Banks with whom it allegedly conspired committed relevant acts in the United States.

that any commercial activity within the gravamen of the Daous' complaint did not have a direct effect in the United States for purposes of the FSIA's commercial activity exception. The district court was therefore correct to hold that BDL is entitled to sovereign immunity and to dismiss the claims against BDL for want of subject-matter jurisdiction.

## CONCLUSION

For the reasons stated above, the judgment of the district court is AFFIRMED.